UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CHARLES RUSSELL RHINES,<br><br>Petitioner,<br><br>vs.<br><br>DARIN YOUNG, Warden, South Dakota State Penitentiary;<br><br>Respondent. | 5:00-CV-05020-KES<br><br><br>ORDER GRANTING SUMMARY JUDGMENT AND DENYING PETITION FOR HABEAS CORPUS |

Respondent, Darin Young, moves the court for summary judgment to deny petitioner, Charles Russell Rhines's, petition for habeas corpus. Rhines resists the motion. On October 23, 2015, the court heard oral argument on the motion. For the following reasons, the court grants the respondent's motion for summary judgment and denies Rhines's petition for habeas relief.

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................................1

PROCEDURAL HISTORY ........................................................................................................4

LEGAL STANDARD ................................................................................................................7

DISCUSSION ......................................................................................................................11

    I.    Were Rhines's Constitutional Rights Violated by the Admission of His June 19 and 21, 1992 Confessions?......11

        A.    Was Rhines adequately advised of his Miranda rights? ..........................................................14

            1.    Caldwell's warning....................................................................................................17

2.  Allender's warnings ........................................................................................................ 18

B.  *Did Rhines validly waive his Miranda rights?* ........................................................*19*

II.  WERE RHINES'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO AN IMPARTIAL JURY VIOLATED BY THE EXCLUSION FOR CAUSE OF PROSPECTIVE JURORS DIANE STAEFFLER AND JACK MEYER? ...................................................22

A.  *Diane Staeffler* ...........................................................................................................*22*

B.  *Jack Meyer* ................................................................................................................*27*

III.  WERE RHINES'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS VIOLATED BY THE STATE'S USE OF PEREMPTORY CHALLENGES? .................................................................................................................................................30

IV.  DID ADMISSION OF VICTIM IMPACT EVIDENCE DURING THE PENALTY PHASE VIOLATE THE *Ex Post Facto* CLAUSE OF THE CONSTITUTION? ..........................................................................................................................36

V.  WAS RHINES'S DEATH SENTENCE INVALIDATED BY THE JURY'S FINDING OF AN AGGRAVATING CIRCUMSTANCE LATER DETERMINED TO BE UNCONSTITUTIONALLY VAGUE?.........................................................................................41

VI.  ARE SOUTH DAKOTA'S CAPITAL PUNISHMENT STATUTES UNCONSTITUTIONAL? ..........................................48

A.  *Does the listing of aggravating circumstances under SDCL 23A-27-1 adequately limit "death eligible" defendants or offenders?* ...............................................................................................*49*

B.  *Do South Dakota's capital sentencing statutes contain insufficient standards to guide the sentencing body's discretion to determine whether a particular defendant will or will not receive the death penalty?* ....*49*

1.  The "torture" aggravating factor ........................................................................... 51

C.  *Does South Dakota unconstitutionally mandate the imposition of a death sentence upon a jury's recommendation and foreclose the discretion of the trial judge?* ....................................................*55*

1.  The jury as the sentencer ..................................................................................... 56

2.  Opportunity to contest the sentencing jury's findings ......................................... 56

D.  *Do South Dakota's statutes require proportionality review without providing adequate guidance or a means of collecting information on death penalty cases?*...............................................................*58*

E.  *Do South Dakota's statutes unconstitutionally mandate consideration of the death penalty for Class A felonies?* ...............................................................................................................................*61*

VII.  WERE RHINES'S CONSTITUTIONAL RIGHTS VIOLATED BY IMPROPER JURY INSTRUCTIONS DURING THE PENALTY PHASE?....63

A.    The "depravity of mind" instruction ........................................................................... 63

B.    The "pecuniary gain" instruction ............................................................................... 64

C.    Did the trial court err in its refusal to give Rhines's proposed jury instruction number 8? ..................... 66

D.    Did the trial court err in its refusal to give Rhines's proposed instruction number 9? ........................... 67

E.    Did the trial court err in its refusal to give Rhines's proposed instruction number 11? ......................... 67

F.    Did the trial court improperly respond to a jury note concerning the meaning of life without parole? ... 70

VIII.   DID SUFFICIENT EVIDENCE SUPPORT THE JURY'S FINDING OF TWO STATUTORY AGGRAVATING CIRCUMSTANCES? ........... 73

A.    Sufficiency of the evidence supporting the pecuniary gain factor ........................................... 74

B.    Sufficiency of the evidence supporting the torture factor ................................................... 76

IX.    DID RHINES'S TRIAL COUNSEL RENDER INEFFECTIVE ASSISTANCE? ..................................................... 81

A.    Was trial counsel ineffective by failing to adequately perform a mitigation investigation on behalf of

Rhines? ............................................................................................................. 82

    1.    Issues IX.A and IX.B: investigation and presentation of mitigation evidence ........................... 84

        a.    Mitigation Investigation ........................................................................... 84

        b.    Presentation ....................................................................................... 88

        c.    Circuit court decision ............................................................................. 91

        d.    Federal habeas ..................................................................................... 96

    2.    Issue IX.I: failure to hire a mitigation expert ....................................................... 100

B.    Was trial counsel ineffective by presenting a "tepid" mitigation case? ................................... 101

C.    Was trial counsel ineffective for failing to inform the jury of Rhines's willingness to plead guilty or not

giving Rhines an opportunity to allocute? .......................................................................... 101

D.    Was trial counsel ineffective for failing to exclude evidence of Rhines's homosexuality? ................... 104

E.    Was trial counsel ineffective for improperly handling a jury note regarding the conditions of life

imprisonment? ...................................................................................................... 106

F.    Was trial counsel ineffective by disproportionately delegating defense work to third-chair counsel? .. 108

G.    Was trial counsel ineffective due to mental and moral shortcomings and expressing a favorable view of

the death penalty? .................................................................................................. 108

H.    *Was trial counsel ineffective for failing to exclude or challenge testimony from Glen Wishard?* .......... *109*

I.    *Was trial counsel ineffective for failing to hire a mitigation expert?* ..................................................... *112*

J.    *Was trial counsel ineffective for failing to exclude testimony concerning Rhines's possession of a gun and his conduct at victim's funeral?* ......................................................................................................... *112*

    1.    Rhonda Graff ............................................................................................................. 113

    2.    Connie Royer ............................................................................................................. 115

X.    Dɪᴅ ᴛʜᴇ Sᴏᴜᴛʜ Dᴀᴋᴏᴛᴀ Sᴜᴘʀᴇᴍᴇ Cᴏᴜʀᴛ Fᴀɪʟ ᴛᴏ Pᴇʀғᴏʀᴍ ɪᴛs Pʀᴏᴘᴏʀᴛɪᴏɴᴀʟɪᴛʏ Rᴇᴠɪᴇᴡ? ....................................... 117

XI.    Dɪᴅ ᴛʜᴇ Tʀɪᴀʟ Cᴏᴜʀᴛ Iᴍᴘʀᴏᴘᴇʀʟʏ Dᴇɴʏ Rʜɪɴᴇs's Mᴏᴛɪᴏɴ ᴛᴏ Aᴘᴘᴏɪɴᴛ ᴀ Fᴏʀᴇɴsɪᴄ Cᴏᴍᴍᴜɴɪᴄᴀᴛɪᴏɴs Exᴘᴇʀᴛ? .......... 119

XII.    Dɪᴅ ᴛʜᴇ Pʀᴏsᴇᴄᴜᴛᴏʀ Eɴɢᴀɢᴇ ɪɴ Mɪsᴄᴏɴᴅᴜᴄᴛ? ...................................................................... 124

A.    *Did the prosecutor improperly argue that Schaeffer's hands were tied prior to his death?* ................. 125

B.    *Did the prosecutor improperly argue that Schaeffer was "gutted?"* ..................................................... 126

C.    *Did the prosecutor act improperly by introducing and using the testimony of Glen Wishard?* ............. 131

D.    *Did the prosecutor act improperly by eliminating all jurors who had misgivings about imposing the death penalty?* ....................................................................................................................................... 132

**CONCLUSION** ............................................................................................................................................. **132**

# PROCEDURAL HISTORY

Rhines was convicted of premeditated first-degree murder for the death of Donnivan Schaeffer and of third-degree burglary of a Dig'Em Donuts Shop in Rapid City, South Dakota. On January 26, 1993, a jury found Rhines should be subject to death by lethal injection. A state circuit judge imposed this sentence. Rhines appealed his conviction and sentence to the South Dakota Supreme Court. Fourteen issues were raised on direct appeal, including the excusal of prospective juror Diane Staeffler, the state's use of its peremptory challenges, the use of victim impact testimony, and the proportionality review.

The South Dakota Supreme Court affirmed Rhines's conviction and sentence, and the United States Supreme Court denied further review on December 2, 1996.

Rhines then applied for a writ of habeas corpus in state court on December 5, 1996. In his state habeas, Rhines raised numerous issues, including ineffective assistance of counsel, the excusal for cause of prospective juror Diane Staeffler, and the constitutionality of the South Dakota capital punishment statutes. The trial court denied Rhines's state habeas on October 8, 1998. The South Dakota Supreme Court affirmed the denial on February 9, 2000.

On February 22, 2000, Rhines filed a federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. An amended petition for writ of habeas corpus was filed on November 20, 2000, that alleged thirteen grounds for relief. Respondent alleged that several of the grounds had not been exhausted and were, therefore, procedurally defaulted. On July 3, 2002, this court found that Rhines's grounds for relief II.B, VI.E, IX.B, IX.H, IX.I, IX.J, XII, and XIII were unexhausted. This court stayed the petition pending exhaustion of Rhines's state court remedies on the condition that Rhines file a petition for habeas review in state court within 60 days and return to federal court within 60 days of completing the state proceedings. Respondent appealed.

On direct appeal, the Eighth Circuit Court of Appeals vacated the stay and remanded the case so this court could determine whether Rhines could proceed by dismissing the unexhausted claims from his petition. *Rhines v.*

5

*Weber*, 346 F.3d 799 (8th Cir. 2003). Rhines filed a petition for a writ of certiorari with the United States Supreme Court. The United States Supreme Court granted certiorari to determine whether a district court may issue an order of stay and abeyance in a case involving a mixed petition for habeas corpus, that is, a petition containing exhausted and unexhausted claims. *Rhines v. Weber*, 544 U.S. 269 (2005). The Supreme Court held that stay and abeyance is permissible under some circumstances. *Id.* at 277. The Court remanded the case to the Eighth Circuit Court of Appeals so it could determine whether this court abused its discretion in granting the stay. *Id.* at 279. The Court specifically stated that "once the petitioner exhausts his state remedies, the district court will lift the stay and allow the petitioner to proceed in federal court." *Id.* at 275-76.

Because this court did not have the benefit of the controlling Supreme Court authority when it issued the order of stay and abeyance in 2002, the Eighth Circuit Court of Appeals remanded the case to this court to analyze the petition for writ of habeas corpus under the new test enunciated by the Spreme Court. *Rhines v. Weber*, 409 F.3d 982, 983 (8th Cir. 2005). This court was directed to analyze each unexhausted claim to: (1) determine whether Rhines had good cause for his failure to exhaust the claims in state court, (2) determine whether the claims were plainly meritless, and (3) consider whether Rhines had engaged in abusive litigation tactics or intentional delay. *Id.* (citing *Rhines*, 544 U.S. at 277-28). On December 19, 2009, this court found that Rhines had good cause for failing to exhaust the claims, the claims were not

plainly meritless, and Rhines had not engaged in abusive litigation tactics.
Docket 150. The court ordered that Rhines's petition for habeas corpus was
stayed pending exhaustion in state court. *Id.*

Rhines returned to state court to exhaust his claims. On February 27,
2013, the Circuit Court for the Seventh Judicial Circuit of South Dakota
entered judgment in favor of respondent on all of Rhines's claims. Rhines
timely requested a Certificate of Appealability from both the Circuit Court and
the Supreme Court of South Dakota. His request was denied on July 17, 2013.
In early October of 2013, Rhines filed a petition for certiorari with the United
States Supreme Court. The Court denied the petition on January 21, 2014.
Docket 223. On February 4, 2014, this court lifted the stay on Rhines's federal
habeas corpus proceeding. Docket 224. That same day, respondent filed the
present motion for summary judgment. Docket 225. On October 22, 2015, the
court heard oral argument on the motion and granted the parties an
opportunity to submit further briefing on two issues: (1) on the interplay
between the standards of review applicable to Rule 56 of the Federal Rules of
Civil Procedure and § 2254(d); and (2) on the relationship between *Martinez v.
Ryan*, 132 S. Ct. 1309 (2012) and *Cullen v. Pinholster*, 563 U.S. 170 (2011). The
parties have completed the round of supplemental briefing.

## LEGAL STANDARD

Section 2254 of Title 28, as amended by the Antiterrorism and Effective
Death Penalty Act (AEDPA), governs a district court's authority to grant a writ
of habeas corpus to state prisoners. Here, respondent has moved for summary

7

judgment. Generally, when a party moves for summary judgment, Rule 56 of the Federal Rules of Civil Procedure applies, and the court views the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). The Federal Rules of Civil Procedure apply to § 2254 proceedings "to the extent that they are not inconsistent with any statutory provisions[.]" Rules Governing Section 2254 Cases in the United States District Court; *Pitchess v. Davis*, 421 U.S. 482, 489 (1975). The statutory provisions of AEDPA provide the standard of review applicable to § 2254 proceedings, and AEDPA overrides the ordinary rules applicable to motions for summary judgment. *See, e.g.*, *Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007) (noting on summary judgment that "AEDPA's deferential standard of review [applies] to the state court's adjudication of a petitioner's claims on their merits."); *Ogan v. Cockrell*, 297 F.3d 349, 356 (5th Cir. 2002) (same); *Workman v. Bell*, 178 F.3d 759, 765 (6th Cir. 1998) (same); *Sanchez v. Shillinger*, 1995 WL 87117 at * 2 (10th Cir. 1995) (unpublished opinion) (same). Thus, although presented as a motion for summary judgment, the court's standard of review is governed by AEDPA.

Where a petitioner's claim has been adjudicated on the merits in a state court proceeding, the district court cannot grant relief unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable

> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1398
(2011). The standard is "difficult to meet," and "[t]he petitioner carries the
burden of proof." *Pinholster*, 131. S. Ct. at 1398. These limitations were
designed "to prevent federal habeas 'retrials' and to ensure that state-court
convictions are given effect to the extent possible under law." *Bell v. Cone*, 535
U.S. 685, 693 (2002). A federal court applies a deferential standard of review
when assessing a state court's disposition of a habeas petition. *See Barnett v.
Roper*, 541 F.3d 804, 814 (8th Cir. 2008).

Under § 2254(d)(1), whether federal law is said to be "clearly established"
is determined by "the holdings, as opposed to the dicta, of [the Supreme
Court's] decisions as of the time of the relevant state-court decision." *Williams
v. Taylor*, 529 U.S. 362, 412 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63,
71-72 (2003) (explaining "clearly established federal law" refers to "the
governing legal principle or principles set forth by the Supreme Court at the
time the state court renders its decision."). The statute's "contrary to" and
"unreasonable application of" clauses have independent meanings. *See
Williams*, 529 U.S. at 405; *Bell*, 535 U.S. at 694. First, "[t]he word 'contrary' is
commonly understood to mean 'diametrically different,' 'opposite in character
or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (quoting
*Webster's Third New International Dictionary* 495 (1976)). Thus, a state court's
decision is said to be "contrary to" clearly established federal law "if the state

court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Court has] done on a set of materially indistinguishable facts." *Bell*, 535 at 694. Second, as to the "unreasonable application of" clause, a federal court may grant relief if "the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Id.* Under this inquiry, the focus is "whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* Thus, a federal habeas court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decisions applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.

Under § 2254(d)(2), the state court's factual determinations will be upheld unless they are objectively unreasonable. *Barnett*, 541 F.3d at 811. Thus, those determinations are "not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 300 (2010). And § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *See Barnett*, 541 F.3d at 811 ("We presume that the state court's findings of fact are correct, and the prisoner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence.' ") (quoting 28 U.S.C. § 2254(e)(1)); *see also*

10

*Smulls v. Roper*, 535 F.3d 853, 858 (8th Cir. 2008) (same). A state court's

adjudication of mixed questions of law and fact is reviewed under § 2254(d)(1).

*Garcia v. Bertsch*, 470 F.3d 748, 754 (8th Cir. 2006); *Evans v. Rogerson*, 223

F.3d 869, 872 (8th Cir. 2000).

## DISCUSSION

### I.   Were Rhines's Constitutional Rights Violated by the Admission of His June 19 and 21, 1992 Confessions?

Rhines was arrested in Seattle, Washington, on June 19, 1992, following

an investigation of a burglary in that state. At approximately 12:45 p.m., King

County Police Officer Michael Caldwell read Rhines the following warning:

> You have the right to remain silent. Number 2, anything you say or sign can be used as evidence against you in a court of law. Number 3, you have the right at this time to an attorney of your own choosing, and to have him present before saying or signing anything. Number 4, if you cannot afford an attorney, you are entitled to have an attorney appointed for you without cost to you and to have him present before saying and signing anything. Number 5, you have the right to exercise any of the above rights at any time before saying or signing anything. Do you understand each of these rights that I have explained to you?

*State v. Rhines*, 548 N.W.2d 415, 424 (S.D. 1996) (hereinafter *Rhines I*); *see*

*also* Docket 215-70 at 14-15 (Suppression Transcript). Caldwell testified that

Rhines did not respond to his inquiry, but instead asked about the presence of

two detectives from South Dakota. Caldwell did not respond or attempt to

question Rhines. Rather, Rhines was brought to a holding cell at the King

County police station.

Approximately six hours later, two Rapid City, South Dakota law

enforcement officers, Detective Steve Allender and Pennington County Deputy

Sheriff Don Bahr, interviewed Rhines at the King County police station. Rhines initially did not want to have his conversation recorded. Allender testified at Rhines's suppression hearing that he read Rhines his *Miranda* rights prior to questioning. Specifically, Rhines was asked:

> You have a continuing right to remain silent. Do you understand that? Anything you say can be used as evidence against you. Do you understand that? You have the right to consult with and have the presence of an attorney, and if you cannot afford an attorney, an attorney can be appointed for you free of charge. Do you understand that? Having these rights in mind, are you willing to answer questions?

*Rhines I*, 548 N.W.2d at 424-25 (altered for formatting); Docket 215-70 at 42-43. Allender testified that Rhines responded affirmatively to each of his questions, although Rhines asked if he had a choice regarding the final inquiry. Allender assured Rhines that he did in fact have a choice and did not have to speak with the officers at all. Following that exchange, Rhines agreed to be interviewed with the caveat that he would answer only the questions he wanted. During the course of the interview, Rhines confessed to murdering Schaeffer and to burglarizing the Dig'Em Donuts Shop.

Approximately two hours into the interview, Rhines allowed Allender to switch on the tape recorder. The conversation between Allender and Rhines included the following exchange:

Q:     Ok. Um, do you remember me reading you your rights?

A:     Yes.

Q:     In the beginning? Did you understand all those rights?

A:     Yes.

12

> Q:    And, uh, having those rights in mind you talked to us here?
>
> A:    Yes I have.

*Rhines I*, 548 N.W.2d at 425; Docket 215-1 at 1-2 (June 19, 1992 audio

transcript). Rhines made additional incriminating statements during the taped

portion of the interview.

Two days later, on June 21, 1992, Allender and Bahr interviewed Rhines

again. This interview was also tape recorded. At the beginning of the interview

the following exchange between Allender and Rhines occurred:

> Q:    . . . Ok, Charles, let me ah, advise of your rights again, ok. Could
>        you answer as far as you understand 'em or not. Ok. You have the
>        continuing right to remain silent, do you understand that?
>
> A:    Yes.
>
> Q:    Anything you say can be used as evidence against you. Do you
>        understand that?
>
> A:    Yes.
>
> Q:    You have the right to consult with and have the presence of an
>        attorney, and if you cannot afford an attorney, an attorney can be
>        appointed for you free of charge. Do you understand that?
>
> A:    Yes.
>
> Q:    K. Just like the other night, having these rights in mind, are you
>        willing to answer questions?
>
> A:    Yes.
>
> Q:    Okay. And that, in this case, it goes, if you don't like the question,
>        it doesn't mean that [you're] supposed to answer it.
>
> A:    I can take the 5th Amendment.
>
> Q:    Exactly.

13

*Rhines I*, 548 N.W.2d at 425; Docket 215-2 at 1 (June 21, 1992 audio transcript). Rhines then made further incriminating statements regarding the Schaeffer murder and the Dig'Em Donuts Shop burglary.

Rhines filed a pretrial motion to exclude his incriminating statements. The trial court denied the motion. Allender was allowed to testify regarding statements Rhines made during the untaped portions of their conversations. Additionally, the state played the recordings of Rhines's June 19 and 21 interviews. Rhines challenged the trial court's admission of his statements on direct appeal. *Rhines I*, 548 N.W.2d at 424-29. Rhines argued that he did not receive adequate *Miranda* warnings prior to the interviews and that he did not give a valid waiver of his *Miranda* rights. The South Dakota Supreme Court disagreed.

### A.    Was Rhines adequately advised of his *Miranda* rights?

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), the Supreme Court held that the privilege against self-incrimination enunciated by the Fifth Amendment is implicated whenever law enforcement subjects an individual to custodial interrogation. In that situation, the Court instructed that certain "[p]rocedural safeguards must be employed to protect the privilege[.]" *Id.* at 478-79. Thus, in the absence of other equally effective procedures, officers must apprise a suspect prior to any questioning that:

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479. Those rights, as well as the opportunity to exercise them, must be afforded to an individual throughout the interrogation. *Id.* An individual may nonetheless knowingly and voluntarily waive those rights and agree to answer questions or make a statement. *Id.* But if those rights are not conveyed or honored, or if the individual does not knowingly and voluntarily waive them, no evidence obtained as a result of the interrogation may be used against the individual. *Id.*

The Supreme Court has explained, however, that "these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). Rather, "the inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' " *Id.* (quoting *California v. Prysock*, 453 U.S. 355, 361 (1981) (alterations in original)).

The South Dakota Supreme Court observed similar dictates from contemporary United States Supreme Court cases before reaching the merits of Rhines's arguments. *Rhines I*, 548 N.W.2d at 425-26 (citations omitted). First,

15

the Court rejected Rhines's contention that he had not been advised of his right to terminate the officers' questioning at any time. Specifically, the Court noted that Allender's warning on June 19 informed Rhines of his "continuing right to remain silent." *Id.* at 426-27. Earlier that day, Caldwell also told Rhines that he had the right to remain silent and to exercise any of his rights at any time. *Id.* at 427. The Court found that this earlier warning, and the lack of intervening interrogation, served to reinforce the fact that Rhines was appraised of his continuing right to remain silent. *Id.* Further, the Court found that Rhines's caveat and practice of only answering the questions he wished demonstrated that he understood his right to terminate the questioning at any time. *Id.* (noting that Rhines switched off the tape recorder on occasion to answer certain questions). And on June 21, Allender again informed Rhines of his continuing right to remain silent and that he did not have to answer any questions if he so chose. *Id.*

Second, the South Dakota Supreme Court rejected Rhines's argument that he had not been informed of his right to have an attorney present during questioning. To the contrary, the Court noted that at the outset of the June 19 and 21 interviews, Allender told Rhines that he could consult with and have an attorney present. *Id.* Third, the Court rejected Rhines's assertion that he was not informed that an attorney would be appointed for him if he could not afford one. The Court observed that Allender told Rhines that if he could not afford an attorney, an attorney "can" be appointed for him. While Allender's use of the word "can" may not have been as definitive as stating an attorney "would" or

16

"must" be appointed, the Court concluded that Allender's warning nonetheless reasonably complied with the substance of *Miranda. Id.* at 428 (citing *Miranda,* 384 U.S. at 473). Consequently, the Court concluded that Rhines received adequate *Miranda* warnings.

Here, Rhines argues the South Dakota Supreme Court's conclusion was an objectively unreasonable application of clearly established federal law. Specifically, Rhines argues that neither Caldwell's warning nor the two warnings issued by Allender satisfy *Miranda.*

### 1.    Caldwell's warning

Rhines does not attack the substance of Caldwell's warning, but argues that because it was issued roughly six hours prior to his interrogation, it was too remote in time to be effective. Rhines relies on a quotation from the *Miranda* decision that "a warning *at the time of the interrogation* is indispensable . . . to insure that the individual knows he is free to exercise the privilege at that point in time." *Miranda,* 384 U.S. at 468 (emphasis added).

Rhines's argument has three problems. The first is that the quoted language from the Court's decision is, in context, a reiteration of the general requirement that the warning must be given prior to any questioning in order to be effective, rather than ascribing a specific temporal limitation on the warning itself. *See id.* at 467-68 ("if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent."). Second, even if the language could be read to support the reading Rhines gives it, Rhines has cited no clearly established

17

federal law from the Supreme Court holding that a six hour delay between a valid warning and a subsequent interrogation prefaced by another warning is impermissible. *See* Docket 232 at 10 (citing *State v. Roberts*, 513 N.E.2d 720 (Ohio 1987)). And finally, the South Dakota Supreme Court did not simply rely on Caldwell's warning. Rather, the Court explained that his warning "reinforced" the fact that Rhines was aware of his *Miranda* rights at the outset of the interview. *Rhines I*, 548 N.W.2d at 427.[1]

### 2.   Allender's warnings

As to the warnings given by Allender, Rhines raises the same three arguments that were made on direct appeal. Namely, that he was not apprised of his right to terminate the questioning if he desired, that he was not told of his right to have counsel present, and that he was not advised that an attorney would be appointed for him if he could not afford one. Rhines does not explain how the South Dakota Supreme Court unreasonably applied clearly established federal law when it rejected these very arguments. Rather, Rhines attempts to relitigate whether, as a matter of substance, the warnings issued by Allender were legally sufficient. That, however, is in contravention of this court's role in federal habeas. *See Bell*, 535 U.S. at 693.

Rhines was told at the beginning of each interview that he had the continuing right to remain silent. He was told that anything he said could be

---

[1] Rhines also makes the unsupported argument that a *Miranda* warning itself is only effective as it relates to the specific crime or crimes for which an individual is arrested. Rhines's argument is contradicted by *Colorado v. Spring*, 479 U.S. 564, 576 (1987) (concluding *Miranda* does not require an individual to be apprised of every offense for which he may be interrogated).

used as evidence against him. He was told that he had the right to consult with or have an attorney present. And he was told that if he could not afford an attorney, an attorney could be appointed for him. Rhines was then asked if he understood those rights, to which Rhines responded affirmatively. Additionally, Rhines was told that he did not have to answer any questions he did not want to answer. Rhines responded that he would answer only the questions he wanted and that he could invoke the Fifth Amendment. Rhines's statements illustrate that he knew he could stop answering questions if he desired. While Allender may not have recited the language of *Miranda* verbatim, "the initial warnings given to [Rhines] touched all the bases required by *Miranda*." *Duckworth*, 492 U.S. at 203. Thus, the court concludes that the South Dakota Supreme Court did not unreasonably apply clearly established federal law when it determined that Rhines received effective *Miranda* warnings prior to his June 19 and 21, 1992 interviews.

### B.   Did Rhines validly waive his *Miranda* rights?

As discussed in issue I.A, *supra*, the Supreme Court observed that after a *Miranda* warning is given, an "individual may knowingly and intelligently waive [his *Miranda*] rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. The question of whether an individual has waived his *Miranda* rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The court must inquire "into the totality of the circumstances surrounding the interrogation" to make that

19

determination. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

The South Dakota Supreme Court noted that after finding a valid *Miranda* warning, its next task was to determine if Rhines waived his rights. *Rhines I*, 548 N.W.2d at 429. The Court then made its inquiry based upon the totality of the circumstances. *Id.* Finding a valid waiver, the Court explained:

> When asked whether he understood his rights, Rhines responded that he did. He then answered affirmatively when asked if he was willing to answer questions. He was articulate and detailed in making his statements. There is no indication that Rhines was under the influence of drugs or alcohol or that he was otherwise impaired in his functioning. Nor is there any showing that law enforcement officers unlawfully induced or coerced Rhines to make a confession. Additionally, Rhines clearly understood the consequences of relinquishing his rights, including the fact that his statements could be used against him in court. Referring to his reasons for confessing to the murder, Rhines remarked, 'This will come out in court again.' At another point in the questioning, Rhines told Allender and Bahr, 'If you guys bring some of this stuff into court, you're gonna look really foolish[.]' When Allender reminded Rhines that 'this isn't court,' Rhines replied, 'No. But it will be.' Rhines also boldly professed to have knowledge of the statutory and case law. . . . [Rhines's] gratuitous statements reflect an individual who is aware of the potentially grave legal consequences of his confession.

*Id.*

Rhines does not take issue with any of the court's findings, but rather contends that his understanding of his rights is irrelevant. Rhines supports this argument with a quotation from *Miranda*:

> [W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, *whatever the background of the person interrogated*, a warning at the time of the interrogation is

20

> indispensable to overcome its pressures and to insure that the
> individual knows he is free to exercise the privilege at that point in
> time.

Docket 232 at 15 (quoting *Miranda*, 384 U.S. at 469) (alteration and emphasis in original).

First, the Court's subsequent holdings in *Butler* and *Fare* make clear that a defendant's background and understanding are relevant to whether, under the totality of the circumstances, the defendant has effectively waived his or her rights. Second, Rhines's quoted language from *Miranda* stands for the proposition that the warning must be given even if the defendant may already know the rights he or she possesses. *See Miranda*, 384 U.S. at 469 (noting the court will not attempt to ascertain "whether the defendant was aware of his rights without a warning being given."). The South Dakota Supreme Court applied the appropriate analysis as dictated by clearly established federal law to determine whether Rhines waived his *Miranda* rights. Thus, the South Dakota Supreme Court's determination that Rhines did in fact waive his *Miranda* rights is not an objectively unreasonable application of the law. Consequently, Rhines is not entitled to relief on this claim.[2]

---

[2] Rhines's federal habeas petition includes an argument that his confessions were involuntary because they were procured by a statement from Allender to the effect that South Dakota had not executed an inmate in fifty years. Rhines did not brief this issue, and the South Dakota Supreme Court did not address it as part of Rhines's direct appeal. Rhines's first habeas appeal before the South Dakota Supreme Court addresses this allegation in conjunction with an ineffective assistance of trial counsel claim. *See Rhines v. Weber*, 608 N.W.2d 303, 309 (S.D. 2000). The court noted that (1) Allender's observation was factually accurate; (2) no facts suggested the statement induced Rhines to confess; (3) Rhines in fact made incriminating statements

**II.   Were Rhines's Sixth and Fourteenth Amendment Rights to an Impartial Jury Violated by the Exclusion for Cause of Prospective Jurors Diane Staeffler and Jack Meyer?**

**A.   Diane Staeffler**

During the jury selection process, the defense and state attorneys, and the trial court, each questioned potential juror Diane Staeffler about her views on the death penalty and her ability to follow the court's instructions. *See Rhines I*, 548 N.W.2d at 429-30; Docket 215-3 at 12-36. At times, Staeffler responded to questions by the defense by indicating her willingness and ability to serve impartially. For example:

> Q:   Okay. Now, I am going to ask you the general question of what your views on the death penalty are.
>
> A:   I guess there have been times when I thought that it was something that should maybe happen, but I don't like it, but there have been some things that have happened that I have read about that I felt like maybe that probably would be the best thing, depending on the circumstances.
>                                        . . .
> Q:   Now, your feeling concerning the death penalty would not prevent you from following the Court's instructions and considering it; whether you decide to apply it or not is up to you, but you would consider it, would you not?
>
> A:   Yeah.

Docket 215-3 at 17-18.

At other times, Staeffler responded to the state's questions by indicating she could not be impartial. For example:

---

before Allender made his remark; and (4) Rhines himself responded "There is a first time for everything," indicating his awareness of the consequences of his confession. *Id.* Rhines has not shown that the court's findings were incorrect or that his confession was involuntarily given because of Allender's comment.

Q:    I'm interested in one of the comments you made . . . when you said
       you'd rather not be on, what were you telling us?

A:    I just really don't know, to make a difficult decision for the death
       penalty, if it came to that and live with it later. I don't know how I
       could handle something like that and maybe it was the right
       decision, but I don't know if I could sleep at night knowing that I
       had done that.

                                    . . .

Q:    You don't think you could sit in judgment of someone else and
       follow the instructions and consider and give the death penalty
       consideration, is that right?

A:    No, I couldn't.

Q:    Is there anything you think I could say to you that I could change
       your mind about that?

A:    I just don't think I could do it.

Q:    Under any circumstances?

A:    Well, no.

Docket 215-3 at 19; 22-23. The trial court initially denied the state's request to

excuse Staeffler for cause, but allowed the state to conduct further questioning

on the subject of capital punishment:

Q:    . . . Do you think you'd be leaning in one direction even if you
       found him guilty and in that second stage do you think you'd be
       leaning towards one of those verdicts?

A:    Yes.

Q:    Which one would you be leaning toward?

A:    The life sentence.

                                    . . .

Q:    . . . but by your verdict you can't imagine yourself putting, ever
       putting anyone to death, is that right?

A:    No.

Docket 215-3 at 32-33.

The trial court then asked Staeffler a few questions, including whether she could fairly consider both the death penalty and life imprisonment. Staeffler responded, "No, I guess not." *Id.* at 33. Both sides were then given an additional opportunity to question Staeffler. Finally, the trial court asked Staeffler if she wanted a few minutes to think over her responses. After Staeffler declined, the trial court granted the state's motion to excuse her for cause.

The Sixth Amendment guarantees in relevant part that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]" U.S. Const. amend. VI. "[T]he quest [for an impartial jury] is for jurors who will conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.") The process of *voir dire* affords both the defense and the state an opportunity to winnow out those prospective jurors who would not perform their duties impartially. *Morgan v. Illinois*, 504 U.S. 719, 733-34 (1992).

In *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968), the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." A jury so chosen would not be the

24

impartial one demanded by the constitution, but rather "a jury uncommonly willing to condemn a man to die." *Id.* at 521. But states retain a "legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986). Thus, in *Wainwright*, the Court articulated a standard by which potential jurors *could* be excused for cause based upon their views on capital punishment. "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Moreover,

> [T]his standard . . . does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424-25.

Rhines challenged the trial court's ruling to exclude Staeffler for cause on direct appeal. *Rhines I*, 548 N.W.2d at 429-433. Rhines argued that the trial court erred by allowing the continued questioning of Staeffler and asserted that the court's decision to excuse her for cause was impermissible. The South Dakota Supreme Court disagreed.

25

The South Dakota Supreme Court cited relevant United States Supreme Court decisions, such as *Wainwright*, *Witherspoon*, and similar others, and its own state court decisions applying like rules. It rejected Rhines's argument that the trial court abused its discretion by allowing Schaeffer to be re-questioned, noting the oscillations in the answers she gave to whether or not she could impose the death penalty and the reservations she harbored following the court's instructions. *Rhines I*, 548 N.W.2d at 431. The Court similarly rejected Rhines's argument that Schaeffer had been impermissibly excused for cause. The Court summarized a number of Staeffler's statements and, "[b]ased on a complete review of [her] testimony," concluded her views on the death penalty would prevent or substantially impair her ability to serve as a juror. *Id.* at 433.

Here, Rhines challenges the Court's rejection of his claim that Staeffler had been impermissibly excused for cause. Rhines notes that Staeffler affirmed many times that she could serve impartially and would be capable of following the trial court's instructions. Rhines further argues that Staeffler simply expressed her conscientious or religious scruples toward the death penalty, rather than indicating her views would substantially impair her ability to serve as a juror. Thus, according to Rhines, the South Dakota Supreme Court's decision was objectively unreasonable.

This court disagrees. While Staeffler expressed her opinion that she could consider the imposition of the death sentence and would follow the court's orders, she also stated that she did not want to have to make the death

penalty determination, that she would lean toward imposing a life sentence over death, and that she would not be able to give fair consideration to both options. The trial court noted that "[t]his juror has given a number of different answers" and "[h]er final word on this was that she would not be able to fairly consider both possibilities[.]" Docket 215-3 at 37. As the Court explained in *Wainwright*, a trial court performs an inherently imprecise science when it is asked to determine whether a juror can or cannot be impartial in a given case. That is why the juror need not make her bias "unmistakably clear" before she may be excluded for cause, and why deference is owed to the trial judge who is able to see and hear the juror. *Wainwright*, 469 U.S. at 425-26. It was only after lengthy questioning by each side, and from the court itself, that the trial court determined Staeffler could not be impartial. Based on Staeffler's varying responses, her statement that she could not give each option fair consideration, and the deference due to the trial court, this court concludes that the South Dakota Supreme Court's determination that Staeffler had properly been excused was not objectively unreasonable.

### B.    Jack Meyer

Like Diane Staeffler, Jack Meyer was questioned during the jury selection process about his views on capital punishment. Docket 215-3 at 2-10. Also like Staeffler, Meyer first responded to defense counsel's questions indicating an ability to consider the death penalty and follow the court's instructions:

> Q:    If you were to be instructed that [a sentence of death] is a penalty to be considered in this case and that you as a juror should understand certain circumstances if there is satisfactory proof of

certain circumstances that you should consider imposing the
death penalty, you'd be able to follow that instruction?

A:      Yes.

Docket 215-3 at 2. But when questioned by the state, Meyer expressed

uncertainty about his own impartiality:

Q:      As you sit here today, do you have the ability to envision yourself
being a part of that jury that would be seated over there, coming
back with a verdict that would put this Defendant to death? Can
you envision yourself doing that?

A:      Not actually, no.

                              . . .

Q:      Let me make it real. Would it be fair to say as [you] look at me right
now and as we talk about this, under no circumstances could you
ever envision yourself being part of a jury that would impose the
death penalty on this Defendant?

A:      I guess not.

Docket 215-3 at 6-7. After the state moved to strike Meyer for cause, defense

counsel was allowed to ask more questions. This time, however, Meyer gave

defense counsel a similar response to the one he provided the state:

Q:      So, in other words, if the Court's instructions lead you to that
conclusion that you should consider the penalty of death and
actually consider imposing it and being a member of the jury that
comes in and says, yes, we think the penalty of death ought to be
imposed here, you would be able to follow those instructions?

A:      I'm not sure. . . . I don't think I could be a part of that jury, I really
don't.

Q:      Regardless of the Court's instructions, in other words, if the court
instructed you to consider it?

A:      Yes.

Q:      Okay. Nothing further.

28

Docket 215-3 at 10. Following this last exchange, the trial court granted the state's motion to excuse Meyer for cause.

Rhines did not challenge Meyer's exclusion on direct appeal. Rather, this claim was unexhausted at the time this court entered its order staying the proceedings in 2005. Thereafter, Rhines returned to state habeas court to pursue his unexhausted claim. The Circuit Court for the Seventh Judicial Circuit of South Dakota rejected Rhines's argument that Meyer had been impermissibly stricken for cause. *See* Docket 204-1 at 10-13. Because the South Dakota Supreme Court denied Rhines's motion for a certificate of probable cause without addressing any of his arguments, the state circuit court is the "last reasoned decision" and therefore the relevant state court adjudication for purposes of this court's review. *Mark v. Ault*, 498 F.3d 775, 783 (8th Cir. 2007) ("Because the Iowa Supreme Court denied Mark review, we apply the AEDPA standard to the decision of the Iowa Court of Appeals because it is the 'last reasoned decision' of the state courts.").

The state circuit court noted that its task was to analyze whether Meyer's views would prevent or substantially impair his ability to serve as a juror. Docket 204-1 at 10. It followed the framework laid out by the South Dakota Supreme Court in *Rhines I* and reviewed Meyer's *voir dire* transcript. *Id.* at 11-12. Based upon its review, the court concluded that Meyer "was unable to perform his duties as a juror in accordance with the Court's instructions and his oath." *Id.* at 12.

29

Here, Rhines argues that the court's determination was objectively unreasonable. As with Staeffler, Rhines contends that Meyer testified he could follow the court's instructions. Rhines also argues that while Meyer expressed reluctance about imposing the death penalty, Meyer did not indicate that he could never vote in favor of the death penalty or that he would not consider it.

Although Meyer's *voir dire* differs from Staeffler's in that the trial court did not make its own inquiries of him, Meyer's responses nonetheless demonstrate the same inability to serve as an impartial juror as Staeffler's. While Meyer initially stated he could follow the court's instructions and give fair consideration to the imposition of the death penalty, Meyer retreated from that position and testified that he could not envision himself on a jury that would return a verdict of death. Additionally, Meyer held his ground when defense counsel sought to question him further and reiterated that he did not believe he could follow the court's instructions. The state circuit court's conclusion that Meyer's views would prevent or substantially impair his ability to serve as an impartial juror was therefore not objectively unreasonable. Consequently, Rhines is not entitled to relief based on the exclusion of these two potential jurors.

## III.   Were Rhines's Sixth and Fourteenth Amendment Rights Violated by the State's Use of Peremptory Challenges?

Rhines's third claim is similar to his second, in that it relates to the state's removal of prospective jurors who harbored reservations about imposing the death penalty. These jurors, however, were not excused for cause but were

30

removed by the state's use of its peremptory challenges. Rhines raised this issue on direct appeal, and the South Dakota Supreme Court observed that "[i]t is undisputed the State used peremptory challenges to eliminate prospective jurors who had some reservations about capital punishment." *Rhines I*, 548 N.W.2d at 433. The Court also noted that those jurors "had indicated they could set aside their doubts and be fair and impartial and were therefore not excludable for cause under *Witherspoon* and its progeny." *Id.* The Court ultimately concluded that the use of peremptory challenges in this manner did not offend the state or federal constitution.

The Supreme Court has addressed the use of peremptory challenges by the state. In *Swain v. Alabama*, 380 U.S. 202 (1965), an African-American defendant sought to challenge the state's use of peremptory challenges in his case as violative of the Equal Protection Clause of the Fourteenth Amendment. The Court refused to examine the state's justification for using its peremptory challenges, instead relying on a presumption that the state had properly exercised them. *Id.* at 223. But the Court held that a defendant could make out a prima facie case of discrimination if he or she could demonstrate a widespread or systematic exclusion of potential jurors on the basis of their race in other cases. *Id.* at 223-24. Although much of the *Swain* decision was significantly retooled by *Batson v. Kentucky*, 476 U.S. 79, 91-92 (1986), the *Swain* holding nonetheless provided a detailed discourse about the history and role of the peremptory challenge in American jurisprudence that remains relevant today. The Court observed that "[t]he persistence of peremptories and

31

their extensive use demonstrate the long and widely held belief that [the]

peremptory challenge is a necessary part of trial by jury." *Swain*, 380 U.S. at

219. Moreover,

> The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. . . . Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee "not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held."

*Id.* at 219-20 (internal citations omitted). And elaborating upon the

fundamental difference between the peremptory challenge and challenging a

juror for cause, the Court explained:

> While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. . . . It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be.

*Id.* at 220-21.

While the permissible scope of using peremptory challenges is broad, the

Court in *Batson* held that "a defendant may establish a prima facie case of

purposeful discrimination in selection of the petit jury solely on evidence

concerning the prosecutor's exercise of peremptory challenges at the

defendant's trial." *Batson*, 476 U.S. at 96. To do so, the defendant was required to show "that he is a member of a cognizable *racial* group" and "that the prosecutor has exercised peremptory challenges to remove from the venire members *of the defendant's race*." *Id.* (emphasis added). Later, the requirement that the defendant first be a member of the excluded racial group was removed by *Powers v. Ohio*, 499 U.S. 400, 416 (1991) ("We conclude that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race."). Additionally, the Court has expanded the reach of *Batson* to those cases where prospective jurors were peremptorily excluded on the basis of gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994). The Court held "that gender, like race, is an unconstitutional proxy for juror competence and impartiality." *Id.* at 129.

On direct appeal, Rhines argued that it was impermissible for the state to use peremptory challenges to strike members of the jury that expressed reservations about imposing the death penalty but were not otherwise excludable for cause. The South Dakota Supreme Court rejected this argument, noting that, under South Dakota law, the state and defense were given an equal but limited number of peremptory challenges to use as they saw fit. *Rhines I*, 548 N.W.2d at 433. Additionally, it held that *Batson* and its progeny only encompassed those situations where prospective jurors were peremptorily struck on the basis of race or gender. *Id.* The Court concluded that there was no similar rule that would prevent the state from using its peremptory challenges to strike otherwise qualified jurors because they may be

33

less inclined to impose the death penalty. *Id.* at 435.

Here, Rhines argues that under *Witherspoon*, a prosecutor cannot exclude prospective jurors *for cause* simply because they express qualms or religious scruples with imposing the death penalty. Rhines folds that prohibition into the holding from *Batson* to conclude that a state is likewise forbidden from using its *peremptory challenges* to do what it could not do under *Witherspoon*, namely, to exclude jurors who merely harbor reservations about capital punishment.

While *Witherspoon* and the *Batson* line of cases were clearly established at the time of the South Dakota State Supreme Court's decision, Rhines's claim fails because there is no clearly established federal law extending the reach of these separate doctrines into the realm of the other. The two decisions address two distinct aspects of the jury selection process–exclusion of a juror for cause and exclusion of a juror by peremptory challenge. Challenges for cause are unlimited in number but are circumscribed to permit the exclusion of those jurors who demonstrate an inability to serve fairly and impartially. *Swain*, 380 U.S. at 220; *Witherspoon*, 391 U.S. at 519. Peremptory challenges, by contrast, are limited in number but may be used by either side to strike a potential juror for almost any reason except race, gender, or ethnic background. *Batson*, 476 U.S. at 96; *J.E.B.*, 511 U.S. at 146.

An individual's attitude toward the death penalty that the individual may be able to set aside is wholly unlike an immutable characteristic such as the individual's race or gender. *Lockhart*, 476 U.S. at 175-76. ("Furthermore,

unlike blacks, women, and Mexican-Americans," potential jurors opposed to the death penalty "are singled out for exclusion in capital cases on the basis of an attribute that is within the individual's control."); *see also Brown v. North Carolina*, 107 S. Ct. 423, 424 (1986) (denial of certiorari) (O'Conner, J., concurring) ("Permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon*."). Moreover, those who oppose the death penalty do not comprise the same type of protected class as those groups that were historically excluded from jury service on account of their race or gender. *Cf. J.E.B.*, 511 U.S. at 143 ("Parties may also exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review."). And the Court has rejected the notion that "simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor." *Wainwright*, 469 U.S. at 423. Rather, both the state and the defense are permitted to use their peremptory challenges "to attempt to produce a jury favorable to the challenger." *Lockhart*, 476 U.S. at 178-79; *Holland v. Illinois*, 493 U.S. 474, 484 (1990). Based on the clearly established federal law at the time, this court concludes that the South Dakota Supreme Court did not apply the clearly established federal law in an objectively unreasonable manner. Rhines is not entitled to relief on this claim.

IV.   **Did Admission of Victim Impact Evidence During the Penalty Phase Violate the *Ex Post Facto* Clause of the Constitution?[3]**

South Dakota Codified Law 23A-27A-1 sets forth the aggravating circumstances that make a defendant eligible for the death penalty. Donnivan Schaeffer was murdered on March 8, 1992. The South Dakota legislature amended SDCL 23A-27A-1 to permit "testimony regarding the impact of the crime on the victim's family."[4] The law became effective on July 1, 1992.

Rhines challenged the admission of victim impact evidence by written motion and during trial. The trial court denied Rhines's motion. The trial court found the victim impact testimony was admissible as a response to Rhines's mitigation evidence. Docket 215-71. Moreover, the trial court ordered that the jury would only be allowed "to consider the effect of the victim's loss to his family" and required the state to submit its proposed victim impact evidence in writing to the court for review prior to its admission. *Id.* Following Rhines's mitigation evidence, Peggy Schaeffer, Donnivan Schaeffer's mother, read the paragraph-length statement that had been screened by the trial court. *Rhines I*, 548 N.W.2d at 445. Rhines raised numerous challenges to the admission of this evidence on direct appeal, including whether its admission violated the *Ex Post Facto* clause. *Id.*

---

[3] Rhines's federal habeas petition also challenged the admission of this evidence on Eighth Amendment grounds. Docket 73 at 6. Rhines has subsequently clarified, however, that he "does not argue that the admission of victim impact testimony during the penalty phase violated his rights under the Eighth Amendment." Docket 232 at 30. Rather, his argument is limited to whether the admission of the testimony violated the *Ex Post Facto* clause. *Id.*

[4] This provision is now located at SDCL 23A-27A-2(2).

Article I, section 10 of the Constitution provides that "[n]o state shall . . . pass any . . . ex post facto Law[.]" "Although the Latin phrase '*ex post facto*' literally encompasses any law passed 'after the fact,' it has long been recognized by [the Supreme] Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (citations omitted). The prohibition on *ex post facto* laws "assure[s] that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981). In a case decided early in this nation's history, Justice Chase observed four categories of laws that fell within this prohibition:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action.
>
> 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed.
>
> 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.
>
> 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386, 390 (1798) (Chase, J., seriatim) (altered for formatting).

To determine if a law violates the *Ex Post Facto* clause, the Court has adopted the following two-part test: First, "it must be retrospective, that is, it must apply to events occurring before its enactment," and second, "it must

disadvantage the offender affected by it." *Id.* at 29. Retrospective laws which are merely procedural, however, do not violate the prohibition on *ex post facto* laws even though they may disadvantage the accused. *Collins*, 497 U.S. at 45; *Dobbert v. Florida*, 432 U.S. 282, 293 (1977). These procedural laws are "changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes." *Collins*, 497 U.S. at 45. But "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause." *Id.* at 46.

The South Dakota Supreme Court concluded that the legislative change that permitted the admission of victim impact evidence during the penalty phase of Rhines's trial was not an *ex post facto* law. *Rhines I*, 548 N.W.2d at 446. The Court did not specifically cite or reference any United States Supreme Court authority concerning the *Ex Post Facto* Clause. For purposes of federal habeas review under § 2254(d)(1), however, this court's inquiry is whether the state court's decision was "contrary to" or involved an "unreasonable application of" clearly established federal law, even if the state court did not cite or rely on that law. *Cf. Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original).

While the South Dakota Supreme Court did not specifically address the *ex post facto* issue, its decision referenced *Payne v. Tennessee*, 501 U.S. 808 (1991), a case where the Supreme Court concluded that victim impact evidence

may be admissible during sentencing. *See Payne*, 501 U.S. at 827. The *Payne* decision was handed down almost a year prior to Schaeffer's murder, and the South Dakota Supreme Court concluded that *Payne*'s holding did not implicate the prohibition on *ex post facto* laws. Nonetheless, Rhines argued that the *Payne* opinion required states to pass specific statutes authorizing the admission of victim impact evidence before the evidence was admissible and, because South Dakota's law was not effective until after Schaeffer's murder, that change in the law amounted to an *ex post facto* violation. *Rhines I*, 548 N.W.2d at 446. The South Dakota Supreme Court rejected that argument, noting "no such requirement in the [Supreme] Court's opinion." *Id.*

Here, Rhines argues that because the provision that permits the admission of victim impact evidence was placed in SDCL 23A-27A-1, which is the list of statutory aggravating circumstances, victim impact evidence is an aggravating circumstance. Further, Rhines argues that had the statute not been enacted, victim impact evidence would not have been admissible. Rhines concludes that the 1992 amended version of SDCL 23A-27A-1 ran afoul of several of the categories of *ex post facto* laws identified by Justice Chase in the *Calder* opinion.

First, while SDCL 23A-27A-1 contains a list of the potential aggravating circumstances that may render a defendant eligible for the death penalty, including the provision permitting the admission of victim impact testimony, no plausible reading of the statute supports a conclusion that victim impact evidence was itself a statutory aggravating circumstance. Moreover, the jury

was instructed that only four aggravating factors were to be considered; "victim impact testimony" was not one of them. Docket 241-1 at 4.[5] Furthermore, the jury was specifically instructed that they "may not consider this victim impact evidence as an aggravating circumstance." *Id.* at 15. Consequently, adding a provision for victim impact evidence onto SDCL 23A-27A-1 after Schaeffer's murder did not offend the prohibition of *ex post facto* laws.

Second, Rhines provides no authority for his argument that the victim impact evidence was admissible only by virtue of the July 1, 1992 amendment to SDCL 23A-27A-1. As the South Dakota Supreme Court observed, the *Payne* decision was handed down almost a year prior to Schaeffer's murder. *Rhines I*, 548 N.W.2d at 466. And Rhines points to nothing that would refute the court's reading of *Payne* to impose no such requirement.[6]

Finally, even if the amendment of the statute was a pre-requisite for the evidence's admissibility, the statute would amount to a procedural change and would therefore not violate the prohibition on *ex post facto* laws. Although not explicitly stated as such, the South Dakota Supreme Court observed: "In fact, the Court seems to regard victim impact testimony as no different than other evidence for purposes of determining admissibility." *Id.* The *Payne* Court

---

[5] The court's instruction provided that only three, rather than four, aggravating circumstances were to be considered because the so-called "torture" and "depravity of mind" factors were paired together by statute.

[6] Notably, the *Payne* decision held: "Congress and most of the States have, in recent years, enacted . . . legislation to enable the sentencing authority to consider information about the harm caused by the crime committed by the defendant. *The evidence involved in the present case was not admitted pursuant to any such enactment*[.]" *Payne*, 501 U.S. at 821 (emphasis added).

likewise decreed:

> The States remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs. Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.

*Payne*, 501 U.S. at 824-25. And "[t]here is no reason to treat such evidence differently than other relevant evidence is treated." *Id.* at 827. Likewise, the Supreme Court long ago acknowledged:

> Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done, nor aggravate any crime theretofore committed, nor provide a greater punishment therefor than was prescribed at the time of its commission, nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

*Hopt v. People*, 110 U.S. 574, 589 (1884). Thus, even if the amended statute applied retroactively to Rhines's case, its procedural nature would not implicate the prohibition on *ex post facto* laws. Therefore, the South Dakota Supreme Court's decision was neither contrary to nor did it involve an unreasonable application of clearly established federal law. Rhines is not entitled to relief on this claim.

## V.   Was Rhines's Death Sentence Invalidated by the Jury's Finding of an Aggravating Circumstance Later Determined to be Unconstitutionally Vague?

During the penalty phase of Rhines's trial, the jury found four statutory aggravating circumstances had been proved beyond a reasonable doubt: (1) the

offense committed was outrageously or wantonly vile, horrible or inhuman in that it involved torture; (2) the offense committed was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of the mind; (3) the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest; and (4) the offense was committed for the purpose of receiving money. *Rhines I*, 548 N.W.2d at 452; SDCL 23A-27A-1(3),(6), & (9); *see also* Docket 215-10 (verdict form). On direct appeal, the South Dakota Supreme Court determined the "depravity of mind" aggravating circumstance, as limited by the trial court's instructions to the jury, was unconstitutionally vague. *Rhines I*, 548 N.W.2d at 449. The Court, nonetheless, determined the invalidity of that factor did not mandate reversal of Rhines's death sentence. *Id.* at 453.

The Supreme Court has formulated different rules that apply to "weighing" and "non-weighing" states in the event that a statutory aggravating factor is determined to be invalid. *See, e.g., Zant v. Stephens*, 462 U.S. 862 (1983); *Stringer v. Black*, 503 U.S. 222 (1992). The Court in *Stringer* described a weighing state as one where "after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence." *Id.* For the jury to impose the death sentence, "it must determine that the aggravating factor or factors are not outweighed by the mitigating circumstances, if any." *Id.* at 225. The Court described a non-weighing state as one where the jury,

must find the existence of one aggravating factor before imposing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case. Instead, under [such a] scheme, " '[i]n making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial. These circumstances relate both to the offense and the defendant.' "

*Id.* at 229-30 (quoting *Zant*, 462 U.S. at 872).

When a statutory aggravating factor is subsequently determined to be invalid, "the difference between a weighing State and a non[-]weighing State is . . . of critical importance." *Id.* at 231. In a weighing state,

when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale. When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.

*Id.* at 232. By contrast, in a non-weighing state,

so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation resulting from the introduction of the invalid factor in an earlier stage of the proceedings.

*Id.*

With this background in mind, the South Dakota Supreme Court concluded that South Dakota is, like Georgia in *Zant*, a non-weighing state. *Rhines I*, 548 N.W.2d at 453. According to the Court, this is because South

Dakota's "statutes do not require the jury to weigh aggravating circumstances against mitigating factors, and the jury was not instructed to consider the specific number of aggravating factors in deciding whether to render a death sentence." *Id.* While the jury is allowed "wide discretion in evaluating mitigating and aggravating facts," the jury is not told to weigh any of the aggravating circumstances it has found against the mitigating factors, if any. *Id.* at 437-38.

The jury in Rhines's case was instructed that it should consider "any and all mitigating circumstances," but it was not told to weigh mitigating evidence against aggravating factors to determine what sentence to impose. *See* Docket 214-1 at 18 (Instruction 16). Rather, the jury was instructed to consider "all of the facts and circumstances of the case, including mitigating and aggravating circumstances which you find to exist[.]" *Id.* at 21 (Instruction 19). And the jury was told that it could impose a life sentence, even if it found the presence of one or more aggravating factors, "for any reason satisfactory to you, or without any reason." *Id.* at 20 (Instruction 18).

Relying on the *Zant* decision,[7] the South Dakota Supreme Court concluded the invalidity of the "depravity of mind" circumstance did not warrant setting aside Rhines's sentence. *Rhines I*, 548 N.W.2d at 453. The Court's determination was briefly revisited during Rhines's first habeas appeal

_____

[7] The South Dakota Supreme Court specifically addressed the various procedural safeguards in the Georgia capital sentencing regime that were analyzed and approved of in *Zant.* The Court noted that South Dakota's death penalty scheme is modeled on Georgia's and that each of those safeguards were present in South Dakota's statutory framework. *Rhines I*, 548 N.W.2d at 453. The only finding that Rhines challenges here is the Court's determination that South Dakota is a non-weighing state.

when he argued that the Court was required to perform the constitutional harmless-error analysis described in the *Stringer* opinion. *See Rhines II*, 608 N.W.2d at 314. Rejecting this argument,[8] the Court reiterated its holding from *Rhines I*, explaining that "[t]his Court has clearly held that South Dakota law does not require the weighing of aggravating circumstances against mitigating factors." *Id.*

Here, Rhines does not dispute the South Dakota Supreme Court's observation that its state's laws do not require the jury to mentally weigh aggravating circumstances against mitigating factors in reaching its decision. According to Rhines, however, that is not what differentiates a weighing state from a non-weighing state. Rather, Rhines argues that the test is whether the only aggravating factors a jury may consider are those specified by statute. If so, the state is a weighing state. But if the jury is allowed to consider aggravating factors different from or in addition to those spelled out by statute, then it is a non-weighing state. Rhines draws support for this conclusion from *Brown v. Sanders*, 546 U.S. 212 (2006). There, the Court observed that a weighing state is one in "which the only aggravating factors permitted to be considered by the sentencer were the specified eligibility factors." *Sanders*, 546 U.S. at 217. And a non-weighing state is one where the jury is permitted "to consider aggravating factors different from, or in addition to, the [statutory] eligibility factors[.]" *Id.*

---

[8] The South Dakota Supreme Court found that, per *Stringer*, harmless-error analysis is only applicable in weighing states. *Rhines II*, 608 N.W.2d at 315 (quoting *Stringer*, 503 U.S. at 231-32).

The *Sanders* opinion, however, was decided several years after Rhines's direct appeal and first habeas appeal and therefore is incapable of serving as "clearly established federal law" for purposes of this court's review of either decision. *Cf. Williams*, 529 U.S. at 412 (explaining AEDPA's "clearly established" language refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions *as of the time of the relevant state-court decision*.") (emphasis added). But in formulating its description of weighing and non-weighing states, the *Sanders* opinion relied on two cases that were decided prior to Rhines's direct appeal and first habeas appeal. *See Sanders*, 546 U.S. at 217 (citing *Parker v. Dugger*, 498 U.S. 308 (1991) and *Richmond v. Lewis*, 506 U.S. 40 (1992)). The *Parker* opinion described Florida as a weighing state because "the death penalty may be imposed only where specified aggravating circumstances outweigh all mitigating circumstances." *Parker*, 498 U.S. at 318. The *Richmond* decision involved the statutory scheme of Arizona which, the Court observed, "requires the sentencer to weigh aggravating and mitigating circumstances-to determine the relative 'substan[ce]' of the two kinds of factors." *Richmond*, 506 U.S. at 47 (alteration in original).

While the *Parker* decision observed that Florida's laws define which specific aggravating factors the jury can consider, *Parker*, 498 U.S. at 313, the *Stringer* decision explained that the distinction that makes a state a weighing state is whether the jury "must weigh the aggravating factor or factors against the mitigating evidence." *Stringer*, 503 U.S. at 229. And while *Richmond* was decided after *Stringer*, *Richmond* recited a similar general balancing standard.

46

*See Richmond*, 506 U.S. at 46 ("Second, in a 'weighing' State . . . the aggravating and mitigating factors are balanced against each other[.]"). Additionally, neither *Parker* nor *Richmond* invalidated *Zant*, which the *Stringer* court cited approvingly. Thus, *Parker* and *Richmond* are not inconsistent with the framework utilized by the South Dakota Supreme Court. *See also Clemons v. Mississippi*, 494 U.S. 738, 745 (1990) (holding Mississippi is a weighing state because "the jury is required to weigh any mitigating factors against the aggravating circumstances"); *Tuggle v. Netherland*, 516 U.S. 10, 11 (1995) (explaining that *Zant's* treatment of non-weighing states "did not apply in States in which the jury is instructed to weigh aggravating circumstances against mitigating circumstances in determining whether to impose the death penalty."). As a consequence, the South Dakota Supreme Court's determination that it was a non-weighing state because its state's laws did not require the jury to weigh aggravating and mitigating factors against each other was not an unreasonable application of the clearly established federal law at that time.

Furthermore, to the extent that *Parker* and *Richmond* could be read to be in tension with *Stringer*, that does not benefit Rhines. If the Supreme Court has not "clearly established" an issue of federal law, the state court's interpretation of that unsettled issue will not entitle a habeas petitioner to relief. *See, e.g., Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' ") (quoting *Carey*, 549

47

U.S. at 77) (alteration in original); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented . . . 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.'") (alterations in original); *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("But this Court has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."). Thus, to the extent *Parker* and *Richmond* created some ambiguity about what classifies a state as a weighing state, the South Dakota Supreme Court's determination that South Dakota was a non-weighing state could not be said to be an unreasonable application of clearly established federal law. Consequently, Rhines is not entitled to relief on this claim.

## VI.   Are South Dakota's Capital Punishment Statutes Unconstitutional?

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court declared in a single-paragraph per curiam opinion that the methods of imposing the death penalty in Georgia and Texas violated the constitutional prohibition on cruel and unusual punishment. Nine separate concurring and dissenting opinions followed. Thereafter, the Court clarified that a capital sentencing scheme must not be "arbitrary and capricious," *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (Stewart, J., concurring), nor leave the sentencer with "standardless and unchanneled" discretion. *Godfrey v. Georgia*, 446 U.S. 420, 429 (1980) (Stewart, J., plurality); *see also Zant*, 462 U.S. at 874 ("A fair statement of the consensus expressed by the Court in *Furman* is 'that where discretion is

48

afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' ") (quoting *Gregg*, 428 U.S. at 189).

> **A.    Does the listing of aggravating circumstances under SDCL 23A-27A-1 adequately limit "death eligible" defendants or offenders?**
>
> **B.    Do South Dakota's capital sentencing statutes contain insufficient standards to guide the sentencing body's discretion to determine whether a particular defendant will or will not receive the death penalty?**

Rhines combines his argument on issue VI.A with issue VI.B. *See* Docket 232 at 46. Therefore, the court will address them together.

The jury found that four statutory aggravating factors had been proved beyond a reasonable doubt: depravity of mind, torture of the victim, committing the crime to avoid arrest, and committing the crime for pecuniary gain. On direct appeal, the South Dakota Supreme Court determined that the "depravity of mind" aggravating factor was unconstitutionally vague. *See Rhines I*, 548 N.W.2d at 452.

With regard to Rhines's complaints about the other aggravating circumstances, the South Dakota Supreme Court stated:

> Rhines makes the generalized complaint that the pool of death eligible offenses is too broad. *He does not articulate any specific reasons why these classifications are inadequate.* We note the United States Supreme Court has approved a state capital punishment scheme that is nearly identical to South Dakota's death penalty laws. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Rhines' general allegations defy more meaningful review and therefore fail.

*Rhines I*, 548 N.W.2d at 437 (emphasis added). Rhines also argued in state court that South Dakota's statutes do not adequately guide the jury's determination of how to treat aggravating and mitigating evidence. On direct appeal, the South Dakota Supreme Court rejected this argument, finding that the constitution did not require juries to be instructed to weigh the aggravating and mitigating factors against each other. *Rhines I*, 548 N.W.2d at 438.

Here, in issues VI.A and VI.B, Rhines does not address whether the South Dakota Supreme Court's rejection of his arguments was improper. Rather, while Rhines titles his assertions before this court the same as the exhausted arguments he made before the South Dakota Supreme Court, in substance he is raising new vagueness arguments. And while Rhines attacked the "depravity of mind" portion of the state statute for vagueness on direct appeal, he did not argue that the "torture" portion of the statute was vague.[9] It is well-established that a federal habeas court cannot adjudicate a claim for relief under § 2254 that was not first fairly presented to the state court for resolution. *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); 28 U.S.C. § 2254(b)(1). Nonetheless, because the "depravity of mind" and "torture" circumstances are included in the same statutory subsection, and because

---

[9] Rhines contends that the South Dakota Supreme Court acknowledged that an aggravating circumstance that mentions "torture" is, without further explanation, unconstitutionally vague. Docket 232 at 46. Although the South Dakota Supreme Court made a general citation to SDCL 23A-27A-1(6), its analysis was explicitly focused on whether the "depravity of mind" factor, as instructed by the trial court, was unconstitutionally vague. *Rhines I*, 548 N.W.2d at 448. It did not, as Rhines suggests, address a vagueness argument related to the torture portion of the statute.

50

Rhines did specifically challenge the "depravity of mind" portion of it for vagueness, this court will assume Rhines fairly presented that issue to the South Dakota Supreme Court.

Additionally, Rhines did not challenge the "avoiding arrest" factor. In fact, the South Dakota Supreme Court observed:

> In addition to the pecuniary gain circumstance, the State also alleged that the offense "was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." SDCL 23A–27A–1(9). *Rhines does not dispute that he murdered Schaeffer to cover up Rhines' identity as the burglar and assailant so as to satisfy this aggravating circumstance.*

*Rhines I*, 548 N.W.2d at 450 (emphasis added). Likewise, in another portion of the Court's opinion, it noted that "[i]n Rhines' case, the jury found four statutory aggravating circumstances. . . . Rhines did not challenge the jury's finding that he committed the offense for the purpose of avoiding lawful arrest." *Id.* at 452. And when the Court undertook its mandatory appellate review, it found that "Rhines does not dispute that he committed the murder to avoid being arrested, thereby satisfying aggravating circumstance SDCL 23A–27A–1(9); there is substantial evidence in the record to support this finding." *Id.* at 455. Thus, Rhines failed to present this issue in his state court proceedings prior to raising it here. Consequently, the claim fails. *Cf. Baldwin*, 541 U.S. at 29.

### 1.    The "torture" aggravating factor

South Dakota law identifies as an aggravating factor: "The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture,

depravity of mind, or an aggravated battery to the victim." SDCL 23A-27A-1(6). In *Gregg*, 428 U.S. at 201, the Court expressed skepticism concerning similar language in a Georgia statute, noting "[i]t is, of course, arguable that any murder involves depravity of mind or an aggravated battery." Even so, however, the Court explained that "this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." *Id.*

In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court described the role that aggravating circumstances play in capital sentencing and the degree to which those circumstances must be defined. The Court explained that to be eligible for the death penalty, a defendant must be convicted of a capital crime and the trier must find that at least one aggravating circumstance has been proved. *Id.* at 971-72. As for the aggravating circumstances themselves, they must meet two requirements: "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder," and "[s]econd, the aggravating circumstance may not be unconstitutionally vague." *Id.* at 972 (citations omitted).

Because the eligibility decision "fits the crime within a defined classification," the aggravating factors "almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing the death penalty.' " *Id.* at 973 (quoting *Arave v. Creech*, 507 U.S. 463, 471 (1993)). Thus, to guard against

52

arbitrary and capricious decision making, aggravating factors cannot be " 'too vague.' " *Id.* (quoting *Walton v. Arizona*, 497 U.S. 639, 654 (1990)). An aggravating factor is said to be "too vague" when it "fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman*[.]" *Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988). But the Court explained that its "vagueness review is quite deferential" because the degree of defining aggravating factors " 'is not susceptible of mathematical precision[.]' " *Tuilaepa*, 512 U.S. at 973 (quoting *Walton*, 497 U.S. at 655)). As a basic principle, "a factor is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.' " *Id.* (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (White, J., concurring in the judgment)).

The South Dakota Supreme Court noted these guidelines when it analyzed whether the "depravity of mind" factor was unconstitutionally vague. *Rhines I*, 548 N.W.2d at 447. While the South Dakota Supreme Court made no formal findings on whether the "torture" circumstance is vague, it made the following observation when it addressed Rhines's ancillary claim of whether the evidence was sufficient to support the jury's determination that the "torture" factor had been proved beyond a reasonable doubt:[10]

> In its instructions to the jury, the trial court defined torture as follows:

---

[10] Rhines challenges this portion of the South Dakota Supreme Court's decision in issue VIII.

Torture occurs when a living person is subjected to the
unnecessary and wanton infliction of severe physical or mental
pain, agony, or anguish. Besides serious abuse, torture includes
serious psychological abuse of a victim resulting in severe mental
anguish to the victim in anticipation of serious physical harm. You
would not be authorized to find that the offense of First Degree
Murder involved torture simply because the victim suffered pain or
briefly anticipated the prospect of death. Nor would acts committed
upon the body of a deceased victim support a finding of torture. In
order to find that the offense of First Degree Murder involved
torture, you must find that the Defendant intentionally,
unnecessarily, and wantonly inflicted severe physical or mental
pain, agony or anguish upon a living victim.

Rhines correctly observes that the trial court's instructions list two
essential elements for a finding of torture: (1) the unnecessary and
wanton infliction of severe pain, agony, or anguish; and (2) the
intent to inflict such pain, agony or anguish.

*Rhines I*, 548 N.W.2d at 451-52.

First, this is not a case where the trial court simply repeated the bare

statutory language to the jury as part of its instructions without further

elaboration. *See Godfrey*, 446 U.S. at 426. Rather, it provided detailed

standards and guidelines to channel the jury's decision making. Second, the

trial court's explanatory instruction is similar to instructions the Supreme

Court has previously upheld against vagueness challenges. *See, e.g.*, *Walton*,

497 U.S. at 654 (noting the instruction asked whether "the perpetrator inflicts

mental anguish or physical abuse before the victim's death" and "that mental

anguish includes a victim's uncertainty as to his ultimate fate."); *Proffitt v.

Florida*, 428 U.S. 242, 255-58 (1976) (plurality opinion) (observing the

instruction asked whether the offense involved "the conscienceless or pitiless

crime which is unnecessarily tortuous to the victim."). Thus, the South Dakota

54

Supreme Court's determination that the aggravating factor of torture was
defined and the jury's decision making was properly guided did not involve an
unreasonable application of clearly established federal law.

### C. Does South Dakota unconstitutionally mandate the imposition of a death sentence upon a jury's recommendation and foreclose the discretion of the trial judge?

South Dakota Codified Law 23A-27A-4 provides that if a jury determines
at least one aggravating circumstance has been proved and recommends a
sentence of death, then "the court shall sentence the defendant to death." On
direct appeal, Rhines argued that this provision is unconstitutional because it
prevents the trial judge from reviewing the appropriateness of the jury's capital
sentencing decision. *Rhines I*, 548 N.W.2d at 438. Additionally, Rhines argued
that it denied capital defendants the ability to challenge the sufficiency of the
jury's findings. *Id.*

The South Dakota Supreme Court rejected these arguments. First, it
found no state or federal constitutional requirement that the trial court review
the propriety of the jury's sentencing determination in a capital case. *Id.*
Second, the Court explained that capital defendants, unlike non-capital
defendants, are afforded an automatic appellate review of their sentence. *Id.* at
439. In accordance with South Dakota law, the South Dakota Supreme Court
reviews whether the sentence was imposed under the influence of passion,
prejudice, or any other arbitrary factor; whether the evidence supported the
trier's finding of an aggravating factor; and whether the defendant's sentence
was disproportionate from the penalties imposed in similar cases. *Id.* (quoting

SDCL 23A-27A-12). Thus, the Court found no constitutional infirmity.

Here, Rhines maintains that the capital sentencing structure is unconstitutional because the trial court is bound to accept the jury's recommendation and because Rhines was not afforded the opportunity to challenge the sufficiency of the sentencing body's findings. The court will address these claims separately.

### 1.    The jury as the sentencer

In *Gregg*, the Supreme Court described the capital sentencing structure of Georgia. Among other provisions, the Court noted that during the penalty phase of the trial, "the jury, or the trial judge in cases tried without a jury, must find beyond a reasonable doubt one of the 10 aggravating circumstances specified in the statute." *Gregg*, 428 U.S. at 164-65. A sentence of death could not be imposed unless the "the jury (or judge) finds one of the statutory aggravating circumstances then elects to impose that sentence." *Id.* at 165-66. And the Court observed that "[i]n jury cases, the trial judge is bound by the jury's r[ec]ommended sentence." *Id.* Thus, South Dakota Supreme Court's determination that the Constitution does not require the trial court to review the propriety of the jury's sentencing decision did not involve an unreasonable application of clearly established federal law.

### 2.    Opportunity to contest the sentencing jury's findings

The Supreme Court in *Gregg* also made the following observation about Georgia's capital sentencing procedures:

56

> As an important additional safeguard against arbitrariness and
> caprice, the Georgia statutory scheme provides for automatic
> appeal of all death sentences to the State's Supreme Court. That
> court is required by statute to review each sentence of death and
> determine . . . whether the evidence supports the jury's finding of a
> statutory aggravating circumstance[.]

*Gregg*, 428 U.S. at 197; *see also Zant*, 462 U.S. at 876 (noting the mandatory

review proceeding was one of two principal features the Court endorsed to help

"adequately protect[] against the wanton and freakish imposition of the death

penalty."). South Dakota Codified Law 23A-27A-9 affords capital defendants an

automatic and mandatory review before the South Dakota Supreme Court, and

SDCL 23A-27A-12 requires, *inter alia*, that the court review whether the

evidence supports the judge or jury's finding of an aggravating circumstance.

Rhines argues South Dakota's statutory scheme is constitutionally

deficient to the extent that it does not afford him the opportunity to contest the

sufficiency of the penalty phase evidence at the trial court level. He relies on

*Jackson v. Virginia*, 443 U.S. 307 (1979), where the Supreme Court examined

the role of federal courts when a habeas petitioner challenges the sufficiency of

the evidence underlying his or her state conviction. The Court in *Jackson* also

recognized that due process affords every individual the constitutional right not

to be convicted of a crime "except upon evidence that is sufficient fairly to

support a conclusion that every element of the crime has been established

beyond a reasonable doubt." *Id.* at 313-14. The Court did not, however, hold

that every capital defendant must be afforded the opportunity to challenge the

sufficiency of the penalty phase evidence against him at the trial court level.

Rhines ignores that he was afforded the opportunity to contest the sentencing jury's findings by virtue of South Dakota's automatic and mandatory appeal mechanism. Even if a defendant fails to make a sufficiency challenge, the South Dakota Supreme Court will automatically review whether the evidence supports the jury's findings on an aggravating circumstance. The Supreme Court in *Jackson* approved of the very structural mechanism South Dakota employs. Rhines points to nothing in *Jackson* or any other case that requires more. Consequently, the South Dakota Supreme Court's decision did not involve an unreasonable application of clearly established federal law.

### D. Do South Dakota's statutes require proportionality review without providing adequate guidance or a means of collecting information on death penalty cases?

Returning to *Gregg*, the Supreme Court observed that another salient feature of Georgia's capital sentencing scheme was that the state supreme court would conduct a proportionality analysis as part of its mandatory appeal process. *Gregg*, 428 U.S. at 198. The Court explained that the state supreme court "compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate." *Id.*

South Dakota Codified Law 23A-27A-8 directs the South Dakota Supreme Court to "accumulate the records of all capital felony cases that the court deems appropriate." When the Court conducts its mandatory review, it considers whether the capital sentence being reviewed is disproportionate to the penalty imposed in "similar cases." SDCL 23A-27A-12(3). On direct appeal,

the Court concluded that those "similar cases" were "those cases in which a capital sentencing proceeding was actually conducted, whether the sentence imposed was life or death." *Rhines I*, 548 N.W.2d at 455. The Court explained its rationale: "[b]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination." *Id.* at 455-56 (quotation omitted).

In Rhines's second habeas proceeding, he argued that the proportionality pool should have included all first-degree homicide cases regardless of whether the sentencing phase was reached. The Circuit Court for the Seventh Judicial Circuit of South Dakota rejected Rhines's argument, finding no constitutional infirmity with the state's "similar cases" definition. Docket 204-1 at 38. Because the South Dakota Supreme Court denied Rhines's motion for a certificate of probable cause without addressing any of his arguments, the state circuit court is the last reasoned decision and therefore the relevant state court adjudication for purposes of this court's review.

Here, Rhines reiterates his argument that the South Dakota Supreme Court's definition of "similar cases" is too narrowly defined because it does not include all first-degree homicide cases. He relies on the Supreme Court's approval of the proportionality review procedure in *Gregg*. But while the Court in *Gregg* approved of the general methodology employed by Georgia, it did not command every state to define its proportionality pool in the manner Georgia

59

had done. *Gregg*, 428 U.S. at 195 ("We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis."). An argument similar to Rhines's was made by the petitioners in *Gregg* and *Proffitt*, and the Court rejected those arguments in footnotes. *Id.* at 204 n.56 (rejecting argument that the proportionality pool was too narrow because "cases involving homicides where a capital conviction is not obtained are not included in the group of cases which the Supreme Court of Georgia uses for comparative purposes"); *see also Proffitt*, 428 U.S. at 259 n.16 (rejecting the argument "that since the Florida Court does not review sentences of life imprisonment imposed in capital cases or sentences imposed in cases where a capital crime was charged but where the jury convicted of a lesser offense" that the state court's proportionality pool was inadequate). Moreover, subsequent to *Gregg*, the Supreme Court held that the constitution does not require that a proportionality review be conducted at all. *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984). What is required in states that employ capital punishment is that the sentencer's discretion be adequately channeled to avoid the arbitrary and capricious imposition of the death penalty that the Court denounced in *Furman. McCleskey v. Kemp*, 481 U.S. 279, 306 (1987). While the proportionality review procedure approved of in *Gregg* is an "additional safeguard against arbitrary or capricious sentencing," the Court "did not declare that comparative review was so critical that without it the Georgia

60

statute would not have passed constitutional muster." *Pulley*, 465 U.S. at 45.

Although South Dakota elected to include such an additional safeguard, Rhines has no constitutional basis to contend that the state's chosen definition of "similar cases" must include consideration of all first-degree homicide cases. *Id.* at 875 ("A federal court may not issue the writ on the basis of a perceived error of state law."); *see also Walton v. Arizona*, 497 U.S. 636, 656 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), (rejecting a challenge to the state's proportionality review and concluding that once the state has undertaken its review in good faith, that "[t]he Constitution does not require us to look behind that conclusion."). While this court disagrees with the parameters the South Dakota Supreme Court has chosen to conduct its proportionality analysis, that is not a sufficient basis for granting Rhines's request for relief because the state circuit court's rejection of Rhines's argument was not contrary to or an objectively unreasonable application of clearly established federal law.

### E.   Do South Dakota's statutes unconstitutionally mandate consideration of the death penalty for Class A felonies?

South Dakota Codified Law 23A-27A-4 provides that a defendant must be convicted of a Class A felony before the death penalty can be considered. The state does not classify all homicides as Class A felonies; rather, premeditated murder is designated as a Class A felony. SDCL 22-16-4; SDCL 22-16-12. In such cases, "the judge shall consider, or shall include in instructions to the jury for it to consider, any mitigating circumstances" and

61

any of the ten statutory aggravating circumstances "which may be supported by the evidence." SDCL 23A-27A-1. The death penalty may not be imposed unless the sentencing body finds at least one statutory aggravating factor beyond a reasonable doubt. SDCL 23A-27A-4. Even if the sentencing body finds that one or more statutory aggravating factors have been proved, it retains the discretion to recommend a life sentence rather than the death penalty. *Id.* If the death penalty is imposed, an automatic appeal process to the South Dakota Supreme Court is triggered. *See* SDCL 23A-27A-9.

Rhines contends that the so-called mandatory consideration provision of SDCL 23A-27A-1 is unconstitutional because it does not sufficiently narrow the class of persons eligible to receive the death penalty. Rhines relies on *Godfrey*, where the Court noted that states must tailor their capital punishment statutes to avoid their application to "every murder." *Godfrey*, 446 U.S. at 428-29. This was an unexhausted claim when this court stayed the proceedings in 2005. Upon Rhines's return to state court, he presented this claim to the Circuit Court for the Seventh Judicial Circuit of South Dakota. That court rejected Rhines's argument, concluding that the state's statutory scheme as a whole was not unconstitutional. Docket 204-1 at 13-15. Because the South Dakota Supreme Court denied Rhines's motion for a certificate of probable cause without addressing any of his arguments, the state circuit court is the last reasoned decision for purposes of this court's review.

Unlike the situation described in *Godfrey*, South Dakota's capital punishment statutes do not make every perpetrator of a homicide eligible for

the death penalty. Rather, a defendant must be convicted of a Class A felony, such as premeditated murder, before consideration of the death penalty can begin. Further, a Class A felony conviction does not make an individual eligible to receive the death penalty unless at least one aggravating circumstance is proven beyond a reasonable doubt, and even then the sentencing body is not required to impose the death penalty. And if the death penalty is imposed, it is subject to automatic review by the South Dakota Supreme Court. Thus, before an individual can receive the death penalty, he must pass through several narrowing mechanisms that separate " 'the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg*, 428 U.S. at 198 (quoting *Furman*, 408 U.S. at 313) (White, J., concurring); *see also Zant*, 462 U.S. at 870-73 (analogizing the narrowing procedure in Georgia to the shape of a pyramid). Rhines has not presented any clearly established federal law that would prohibit the procedure provided by SDCL 23A-27A-1 in light of the state's statutory structure as a whole. Consequently, the circuit court's decision was not contrary to or an unreasonable application of clearly established federal law.

## VII.   Were Rhines's Constitutional Rights Violated by Improper Jury Instructions During the Penalty Phase?

### A.   The "depravity of mind" instruction

Rhines argues that the "depravity of mind" jury instruction given by the trial court, and later determined to be unconstitutionally vague by the South Dakota Supreme Court, rendered his death sentence unconstitutional.

Rhines's argument on this point is co-extensive with his argument in issue V,
*supra*. For the reasons set forth in issue V, *supra*, the court concludes that the
presence of this instruction did not render Rhines's death sentence
unconstitutional.

### B.   The "pecuniary gain" instruction

As an aggravating factor, the state alleged that Rhines murdered
Schaeffer for himself and for the purpose of receiving money. *Rhines I*, 548
N.W.2d at 449; *see* SDCL 23A-27A-1(3). The trial court instructed the jury:

> Before you may find that this aggravating circumstance exists in
> this case, you must find, beyond a reasonable doubt, that each of
> the following elements of this aggravating circumstance are proven
> by the evidence:
>
> 1. That the Defendant committed the murder for himself; and
> 2. That he committed the murder for the purpose of receiving
> money.

*Id.* at 449-50; *see also* Docket 241-1 at 11 (Instruction No. 9). On direct appeal,
Rhines argued that the aggravating circumstance did not apply to him for
several reasons, namely because: "(1) aggravating circumstances should not
overlap so that the same facts can satisfy more than one circumstance; (2) the
receipt of money was a result, rather than a cause, of Schaeffer's murder; (3)
the murder was not part of a larger preexisting plan to obtain the money; and
(4) Rhines had possession of the money before Schaeffer arrived, so the murder
was not necessary to get the money." *Rhines I*, 548 N.W.2d at 450. The South
Dakota Supreme Court disagreed with each of these contentions. *Id.*

Here, without specifying which of his arguments the South Dakota

Supreme Court wrongly rejected, Rhines argues generally that the trial court's jury instruction violated his due process rights. Rhines notes that due process requires the prosecution to prove every element of an offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 316. And Rhines relies on *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979) for the proposition that jury instructions cannot have the effect of relieving the state of its burden of proof. Beyond those general observations, Rhines does not explain how the instruction violated due process principles.

The language used in the jury instruction largely tracked the language provided in the statute. *See* SDCL 23A-27A-1(3) ("The defendant committed the offense for the benefit of the defendant or another, for the purpose of receiving money or any other thing of monetary value[.]"). The instruction stated two elements. Rhines has not shown that the jury was required to find anything beyond or different from the elements as phrased in the instruction. And the instruction properly noted that the jurors had to find each of the elements beyond a reasonable doubt for the factor to apply.

Nonetheless, Rhines argues that the South Dakota Supreme Court should have asked "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).[11] Such an inquiry would have been

---

[11] Rhines relies on *Waddington v. Sarausad*, 555 U.S. 179 (2009) for his argument. While the *Waddington* case itself was decided after Rhines's appeal, the principle it stands for, recited in *Estelle*, was not novel at the time. *Waddington* likewise noted the defendant must show that the instruction was

proper if the jury instruction was ambiguous. *See id.* ("[I]n reviewing an ambiguous instruction such as the one here . . ."). But Rhines does not explain how the instruction could be construed as ambiguous. By its own terms, the instruction asked the jury whether Rhines committed the murder for himself and for the purpose of receiving money. In general, "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). There is no ambiguity with what the jury was asked to decide, and the instruction comported with what was required to be shown by statute. Thus, Rhines's burden is "especially heavy because no erroneous instruction was given." *Id.* at 155. Rhines's unsubstantiated allegation that an otherwise properly phrased instruction nonetheless offended his rights to due process is insufficient. Consequently, the South Dakota Supreme Court's conclusion that the trial court did not err by giving its pecuniary gain instruction is not contrary to or an unreasonable application of clearly established federal law.

### C.   Did the trial court err in its refusal to give Rhines's proposed jury instruction number 8?

On direct appeal, Rhines argued the trial court erred by not giving his proposed instruction number 8, which would have asked the jury to determine whether the aggravating circumstances against him were "sufficiently

---

ambiguous. *Id.* at 190-91.

substantial" to warrant the death penalty. *Rhines I*, 548 N.W.2d at 442-43. The South Dakota Supreme Court rejected Rhines's argument. *Id.* at 443. The failure to give a requested jury instruction may provide a basis for habeas relief only when it can be said that the failure amounted to denial of due process. *See Cupp v. Naughten*, 414 U.S. 141, 147 (1973). While Rhines's federal habeas petition listed this perceived error as one of his claims for relief, Docket 73 at 10, Rhines provides no argument on the matter here. Consequently, the court concludes Rhines has not met his burden to justify relief on this claim.

**D.    Did the trial court err in its refusal to give Rhines's proposed instruction number 9?**

On direct appeal, Rhines argued that the trial court erred when it refused to give his proposed instruction number 9, which would have told the jury that the law presumes an appropriate punishment for first degree murder is life imprisonment without parole. *Rhines I*, 548 N.W.2d at 443. The South Dakota Supreme Court rejected Rhines's argument. While Rhines's habeas petition listed this perceived error as one of his claims for relief, Docket 73 at 10, Rhines has provided no argument on the matter here. Consequently, the court concludes Rhines has not met his burden to justify relief on this claim.

**E.    Did the trial court err in its refusal to give Rhines's proposed instruction number 11?**

On direct appeal, Rhines argued that the trial court erred when it refused to give his proposed jury instruction number 11. That instruction stated:

> The two specified sentences that you are to consider in this case are death, and life in prison without parole.

> In your deliberations, you are to presume that if you sentence
> Charles Russell Rhines to death, he will in fact be executed by
> lethal injection. You must not assume or speculate that the courts,
> or any other agency of government, will stop the defendant's
> execution from taking place.
>
> Similarly, you are to presume that if you sentence Charles Russell
> Rhines to life in prison without parole, he will in fact spend the
> rest of his natural life in prison. You must not assume or speculate
> that the courts, or any other agency of government, will release the
> defendant from prison at any time during his life.

*Rhines I*, 548 N.W.2d at 444. The trial court refused this instruction, and

instead instructed the jury as follows:

> The decision you make will determine the sentence which will be
> imposed by the court. If you decide on a sentence of death, the
> court will impose a sentence of death. If you decide on a sentence
> of life imprisonment without parole, the court will impose a
> sentence of life imprisonment without parole.

*Id.*; *see also* Docket 241-1 at 21 (Instruction No. 19). The South Dakota

Supreme Court found that the trial court's instruction was a full and correct

statement of the law, and the trial court did not err in its refusal of Rhines's

proposed instruction. *Rhines I*, 548 N.W.2d at 444.

The portion of Rhines's proposed instruction that was not included in the

court's jury instruction would have told the jury not to speculate on the

possibility that Rhines's death sentence would be commuted or on the

possibility that he may later be released if he were sentenced to life

imprisonment without parole. Rhines argues this language was necessary for

several interrelated reasons. First, he notes that a defendant's future

dangerousness is not listed as an aggravating factor under SDCL 23A-27A-1.

Second, Rhines argues that his future dangerousness was nonetheless

68

presented to and considered by the sentencing jury as an aggravating factor. Finally, consideration of Rhines's future dangerousness caused the sentencing jury to become more inclined to sentence him to death in order to prevent him from ever being released back into the community. Therefore, his proposed instruction was necessary to cure this inequity, and the rejection of his proposed instruction was a denial of due process.

Although Rhines argued on direct appeal that the trial court's instruction was inadequate, he did not argue that its inadequacy was because his future dangerousness had been put in issue. This issue was raised, however, as one of Rhines's ineffective assistance of counsel claims litigated in his first habeas appeal. *See Rhines II*, 608 N.W.2d at 309-311. The South Dakota Supreme Court rejected this claim and stated:

> First, the State never told the jury that future dangerousness was a factor for them to consider in sentencing. Rhines indicates that the prosecutor made such argument indirectly. For example, the prosecutor told the jury to consider such things as "the death of an innocent witness," and "the greedy killing of . . . [Schaeffer]" when evaluating aggravating circumstances. In addition, he suggested that Rhines knew how to kill with a knife, and that many people in the jury did not know how to kill with a knife. Finally, Rhines contends that the "depravity of the mind" circumstance itself suggested that Rhines would be dangerous in the future.

> However, the prosecutor's comments in this case do not rise to the level of argument in [*Simmons v. South Carolina*, 512 U.S. 154 (1994)], in which the prosecutor expressly told the jury that imposing the death penalty would "be an act of self-defense." *Id.* at 157, 114 S.Ct. at 2191, 129 L.Ed.2d at 139. In addition, the facts of *Simmons* do not support the idea that the "depravity of mind" circumstance, in and of itself, translates into a statement that Rhines' future dangerousness makes him deserving of the death penalty.

*Id.* at 311.

To the extent that Rhines now argues that his future dangerousness in fact was put before the jury because of the allegedly suggestive comments by the prosecutor and the "depravity of mind" instruction, after a review of the record, this court concludes that the South Dakota Supreme Court's determination that future dangerousness was not put at issue and was not a factor for the jury's consideration was not an objectively unreasonable one. And to the extent Rhines disagrees with the Court's finding in *Rhines I* that the trial court's instruction was proper, this court concludes that that decision was not contrary to nor an unreasonable application of clearly established federal law.

**F.    Did the trial court improperly respond to a jury note concerning the meaning of life without parole?**

During the sentencing phase, the jurors sent the trial judge a note containing several questions. The note began:

> Judge Konnekamp [sic],
>
> In order to award the proper punishment we need a clear prospective [sic] of what "Life In Prison Without Parole" really means. We know what the Death Penalty Means, but we have no clue as to the reality of Life Without Parole.

*Rhines I*, 548 N.W.2d at 442. The note contained a number of questions related to prison life. The trial court responded to the note with the following written statement: "I acknowledge your note asking questions about life imprisonment. All the information I can give you is set forth in the jury instructions." *Id.*

Rhines's claim here is a combination of arguments he made in separate proceedings. On direct appeal, Rhines argued that the jury note showed that

the trial court's instruction regarding the meaning of a life imprisonment or death sentence was insufficient and that his proposed instruction number 11 should have been given. *Rhines I*, 548 N.W.2d at 444. The Court rejected Rhines's argument. *Id.* Then in Rhines's first habeas appeal, he argued that his counsel was ineffective because they did not appeal the trial court's refusal to answer the jury note in accordance with *Simmons v. South Carolina*, 512 U.S. 154 (1994). *Rhines II*, 608 N.W.2d at 309-11. The Court rejected the ineffective assistance argument and explained that *Simmons* was distinguishable. *Id.* at 311.

In *Simmons*, the defendant was legally ineligible for parole under South Carolina law due to his criminal history. *Simmons*, 512 U.S. 156. The Supreme Court found that the prosecution had put the defendant's future dangerousness into issue during closing argument by telling the jury that its task was to decide "what to do with [the defendant] now that he is in our midst" and that a death sentence "will be an act of self-defense." *Id.* at 157. Concerned that the jury might believe that the defendant would be eligible for parole even though he was not, defense counsel asked the court to clarify the meaning of "life imprisonment" for the jury and to tell them that the defendant was not eligible for parole. *Id.* at 158. The trial court refused. After 90 minutes of deliberation, the jurors sent the judge a note asking: "Does the imposition of a life sentence carry with it the possibility of parole?" *Id.* at 160. The trial court responded by instructing the jurors not to consider parole, but did not tell them that the defendant was parole ineligible. *Id.* (noting the court only told the

jurors that "[t]he terms life imprisonment and death sentence are to be understood in their [plain] meaning."). Twenty-five minutes later, the jury returned a verdict of death. *Id.*

The Supreme Court concluded that the defendant's due process rights had been violated by the trial court's refusal to clarify that a life sentence would not include the possibility of parole in his case. *Id.* at 161. More specifically, the Court noted that the prosecution had put the defendant's future dangerousness into issue, and that the jury may have been concerned that the only way to ensure the defendant would not be released back into the community was to issue a death sentence. *Id.* By prohibiting the defendant from rebutting this suggestion with factually accurate information concerning his parole ineligibility, the trial court denied the defendant due process. *Id.* at 165.

In rejecting Rhines's ineffective assistance claim, the South Dakota Supreme Court held that *Simmons* was distinguishable for several reasons. First, unlike in *Simmons*, the prosecution did not put Rhines's future dangerousness into issue. *Rhines II*, 608 N.W.2d at 311. Second, even if Rhines's future dangerousness was in issue, the jury in Rhines's case was instructed that life imprisonment meant life without parole, which the trial court in *Simmons* failed to do. *Id.*

Here, Rhines contends that pursuant to *Simmons*, an obligation was imposed on the trial court by virtue of the jury note to further clarify its instruction on the meaning of life imprisonment without parole. This court

disagrees, however, because the instruction given told the jury that a sentence of life imprisonment was without parole. No further clarification was needed. Thus, the South Dakota Supreme Court's decision that *Simmons* did not apply was not contrary to or an unreasonable application of clearly established federal law.

## VIII. Did Sufficient Evidence Support the Jury's Finding of Two Statutory Aggravating Circumstances?

On direct appeal, and in addition to the "depravity of mind" factor, Rhines argued that two statutory aggravating factors did not apply to him, namely: (1) that Rhines killed Schaeffer for pecuniary gain; and (2) that Rhines tortured Schaeffer. *Rhines I*, 548 N.W.2d at 449-52. Rhines did not dispute that he murdered Schaeffer to avoid arrest in satisfaction of a third aggravating factor.[12]

Here, Rhines contends that the evidence was insufficient to support the jury's findings regarding the pecuniary gain and torture factors. The court's inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Rhines's burden is a high one because it "is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on

---

[12] The Court assessed this factor as part of its mandatory review and found "substantial evidence in the record to support this finding." *Rhines I*, 548 N.W.2d at 455.

the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 3 (2011) (per curiam). And "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

### A.    Sufficiency of the evidence supporting the pecuniary gain factor

On direct appeal, Rhines did not specifically contest the sufficiency of the evidence to satisfy the pecuniary gain factor. Rather, he argued the trial court erred in its instructions to the jury and asserted that the factor "should not apply" to him because: "(1) aggravating circumstances should not overlap so that the same facts can satisfy more than one circumstance; (2) the receipt of money was a result, rather than a cause, of Schaeffer's murder; (3) the murder was not part of a larger preexisting plan to obtain the money; and (4) Rhines had possession of the money before Schaeffer arrived, so the murder was not necessary to get the money." *Rhines I*, 548 N.W.2d at 450. The South Dakota Supreme Court stated that "we do not agree that the facts fail to satisfy the pecuniary gain circumstance for any of the reasons listed by Rhines," and it recited a number of facts in support of that conclusion. *Id.*

When Schaeffer arrived at the Dig'Em Donuts Shop, Rhines was already inside the store. As a former employee, Rhines knew where the money in the

store was kept and believed the store would be vacant. When Rhines spoke to Allender and Bahr, he explained that he was surprised by Schaeffer's arrival. Schaeffer was a trusted employee of the Dig'Em Donuts stores, and it was his responsibility to transport money from the West Main Street store location to the other stores in the area. From this, the South Dakota Supreme Court observed that it would be reasonable to infer that Schaeffer would not have allowed Rhines to continue his theft of the store unopposed. And although Rhines may not have intended to kill Schaeffer when Rhines first entered the store, the evidence suggested that Rhines's motives changed when he heard Schaeffer enter. Specifically, Rhines thought about the situation for a moment, went to retrieve his knife, and hid behind an office door. Rhines then attacked and killed Schaeffer. Rhines's statements to Allender indicated that he killed Schaeffer before he retrieved around $1,600 from the store:

> Rhines: I went back in the office and finished getting, finished getting what money I could find. About $1,700. Actually about um, about, oh probably 16, 15-1600 out of there. Change fund, basically.
>
> Allender: Yeah. And then[?]
>
> Rhines: Cleaned out the change fund on the wall.

*Id.* at 450. On those facts, viewed in the light most favorable to the prosecution, a rational factfinder could conclude that Rhines killed Schaeffer for himself and for the purpose of obtaining money.

Rhines does not refute any of the Court's observations. Instead, he denies an argument that is raised in respondent's brief, namely that Rhines

murdered Schaeffer so that he could buy himself a plate of French fries at Perkins. Docket 232 at 74. Rhines then faults the South Dakota Supreme Court for pointing to only "scant additional evidence to support sufficiency of the pecuniary gain aggravator." Docket 232 at 75. But Rhines never asked the South Dakota Supreme Court to make that determination regarding this factor, only the torture factor. *Contra Rhines I*, 548 N.W.2d at 450-51 ("Rhines disputes [the jury's finding of torture], arguing the evidence presented was insufficient to show beyond a reasonable doubt that he tortured his victim."). But to the extent the South Dakota Supreme Court determined that the evidence was sufficient to support the jury's finding regarding the pecuniary gain factor, this court concludes that that determination was not objectively unreasonable.

## B.     Sufficiency of the evidence supporting the torture factor

Unlike the pecuniary gain factor, Rhines specifically contested whether the evidence was sufficient to satisfy the jury's determination that he tortured Schaeffer. *Id.* at 450-52. On direct appeal, the South Dakota Supreme Court noted the instruction and its requisite elements as dictated by the trial court:

> Torture occurs when a living person is subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony, or anguish. Besides serious abuse, torture includes serious psychological abuse of a victim resulting in severe mental anguish to the victim in anticipation of serious physical harm. You would not be authorized to find that the offense of First Degree Murder involved torture simply because the victim suffered pain or briefly anticipated the prospect of death. Nor would acts committed upon the body of a deceased victim support a finding of torture. In order to find that the offense of First Degree Murder involved torture, you must find that the Defendant intentionally,

76

> unnecessarily, and wantonly inflicted severe physical or mental
> pain, agony or anguish upon a living victim.

*Rhines I*, 548 N.W.2d at 451-52. The Court agreed that there were two essential elements that must be proved: "(1) the unnecessary and wanton infliction of severe pain, agony, or anguish; and (2) the intent to inflict such pain, agony or anguish." *Id.* at 452. The Court concluded that both of these elements were satisfied.

The evidence introduced at trial included Rhines's own words as he told Officers Allender and Bahr what occurred at the Dig'Em Donuts Shop. Rhines acknowledged that he was burglarizing the store when Schaeffer unexpectedly arrived. When Schaeffer entered the office area, Rhines admitted that he stabbed him in the abdomen with a hunting knife. According to Rhines, Schaeffer fell down and was "thrashing around and screaming." Docket 215-1 at 4. Schaeffer recognized his assailant and screamed Rhines's name. Rhines stabbed Schaeffer again, this time in the upper left portion of his back. Schaeffer told Rhines that he would not tell anyone what had happened and asked Rhines to call an ambulance. Rhines refused. Rhines helped Schaeffer up, walked him into the back storeroom, and sat him down on a pallet. Rhines said that Schaeffer went "rather willingly like he's decided it's time to go." *Id.* Rhines placed Shaeffer's head between his knees and drove the hunting knife into the base of Schaeffer's skull. Although Schaeffer slumped forward, Rhines claimed that he could still hear Schaeffer breathing and that Schaeffer's arms were moving. Rhines tied Schaeffer's hands behind him because Rhines did not

want him to "stand up" or "call anybody and go dial 911." Docket 215-2 at 7. According to Rhines, Schaeffer continued breathing for several minutes after the third stab wound.

Dr. Donald Habbe, a forensic pathologist, testified at trial. Dr. Habbe explained that the first stab wound would not have been fatal, although it would have caused pain and difficulty breathing. He opined that the second stab wound would have pierced Schaeffer's left lung, which again would not have been fatal but would have caused additional pain and difficulty breathing. Dr. Habbe did not believe the two stab wounds would have been fatal in combination. He opined, however, that the third stab wound cut into Schaeffer's brain stem and should have resulted in a "near instantaneous" death. Dr. Habbe testified that he could not determine if Schaeffer's hands were bound prior to the third stab wound, but noted that the ligature was tied tightly and that there were abrasions along both of Schaeffer's wrists.

Regarding the torturous act element, the South Dakota Supreme Court found that Rhines did not act swiftly to end Schaeffer's life after the first or second non-fatal stab wounds. *See Rhines I*, 548 N.W.2d at 452. Rather, Rhines walked Schaeffer to the back storeroom and ignored Schaeffer's pleas for help. Rhines himself observed that Schaeffer became passive, seeming to acknowledge his impending death. Rhines then arranged Schaeffer on a pallet in order to administer what Rhines described as the "*coup de grace.*" Additionally, the Court explained that when Rhines was questioned about the possibility that he bound Schaeffer's hands before the third stab wound,

78

Rhines's responses were evasive and nonsensical. The Court opined that a juror could have inferred from the evidence that Rhines bound Schaeffer's hands prior to his death. As Dr. Habbe testified, there were abrasions on Schaeffer's wrists that suggested that Schaeffer continued to struggle against his restraints before his death. Thus, the Court concluded the evidence was sufficient to demonstrate that Schaeffer experienced unnecessary mental and physical anguish rather than pain that was simply incidental to his death.

As to the intent element, the Court observed that Rhines did not express any desire to end Schaeffer's life quickly. Rather, as he spoke with Allender and Bahr, Rhines expressed sarcasm and scorn towards Schaeffer's suffering. Rhines also told the officers that his reason for binding Schaeffer's hands was to prevent him from leaving or calling 911, and the evidence suggested that Rhines also intended to leave Schaeffer in the storeroom to die. Therefore, the Court concluded the evidence was sufficient to demonstrate that Rhines intended to torture Schaeffer.

Here, Rhines confronts the intent element first by arguing that the series of events that lead to Schaeffer's death took place over a span of only a few minutes. Rhines observes that the office and the storeroom were nearby, and he relies on Dr. Habbe's opinion that the third stab wound should have resulted in a near instantaneous death. Rhines argues that if Schaeffer was already deceased, then Rhines could not have committed an act of torture by binding Schaeffer's hands. And while Rhines stabbed Schaeffer three times, Rhines argues that that could suggest he was simply startled or an

79

inexperienced killer. Rhines also takes issue with the South Dakota Supreme Court's classification of his attitude toward Schaeffer's suffering as "scornful," arguing that his lack of remorse could be relevant to the depravity of mind factor but not the torture factor.

Next, Rhines argues that the torturous act element could not be satisfied. He observes that the jury instruction told the jurors that they could not find that the torture factor was fulfilled if the victim only briefly anticipated the prospect of death. According to Rhines, the evidence demonstrated a brief period of time between his initial assault upon Schaeffer and Schaeffer's demise.

Viewing the evidence in the light most favorable to the prosecution, however, a rational factfinder could conclude that Rhines tortured Schaeffer. Regarding the act element, Rhines stabbed Schaeffer twice, no doubt inflicting a great deal of pain, before walking Schaeffer to the back room of the store. The jury could infer that Schaeffer experienced severe mental anguish as he recognized the face of his attacker and begged for his life, only to have his pleas ignored as he was taken into the storeroom. Once there, the jury could also infer that Schaeffer believed he could do no more than abandon hope of survival. As Rhines observed, externally Schaeffer appeared docile. And if the jury believed that Rhines bound Schaeffer's hands before his death, the jury could also have determined that Schaeffer struggled before he died thereby causing the abrasions on his wrists. Although Rhines now relies on Dr. Habbe's opinion that Schaeffer should have died nearly instantaneously,

80

Rhines himself disputed that same opinion, telling Allender that "[Habbe] doesn't know everything in the world." Docket 215-2 at 8.

As to the intent element, the jury could have inferred that Rhines stabbed Schaeffer twice in order to disable him. Once Schaeffer was mostly incapacitated, Rhines proceeded methodically, arranging Schaeffer on a pallet before lining up the third stab into the back of Schaeffer's neck. As Rhines stated, he believed Schaeffer was breathing and that he lived for another couple of minutes following the third stab wound. The jury could have further inferred that by binding Schaeffer's hands, Rhines intended to prevent Schaeffer from leaving so that Schaeffer would be left to die in the storeroom alone. And while the trial court's instruction told the jury that it could not conclude that Rhines tortured Schaeffer if Schaeffer only briefly anticipated the prospect of death, it did not preclude the jury from finding that the factor was satisfied if the series of events unfolded in a matter of minutes. Therefore, the court concludes that the South Dakota Supreme Court's determination that the evidence was sufficient to support the torture factor was not objectively unreasonable.

## IX.    Did Rhines's Trial Counsel Render Ineffective Assistance?

Rhines alleges that he received ineffective assistance of counsel at trial. Generally, in order to establish ineffective assistance of counsel, Rhines must satisfy the two-pronged standard articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* This "performance prong" requires a petitioner to "show that counsel's

representation fell below an objective standard of reasonableness." *Id.* at 687-88. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. This "prejudice prong" requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Rhines has the burden of satisfying both *Strickland* prongs. *Id.* at 687. A court is free to evaluate the two prongs in either order. *Id.* at 697.

In the context of § 2254, however, Rhines must overcome an additional hurdle. This court's task is to determine if the state court's decision involved an objectively unreasonable application of the *Strickland* standard. *See Knowles*, 556 U.S. at 122. Because the *Strickland* standard itself is deferential to counsel's performance, and because this court's review of the state court's decision under § 2254 is also deferential, the standard of review applied to Rhines's ineffective assistance claims is "doubly deferential." *Id.* at 123. Consequently, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *see also Pinholster*, 131 S. Ct. at 1403 (noting the petitioner must demonstrate that the state court's determination regarding both prongs was unreasonable to be entitled to relief).

**A.    Was trial counsel ineffective by failing to adequately perform a**

**mitigation investigation on behalf of Rhines?**

The parties combine issues IX.A, IX.B, and IX.I, together as each claim involves the performance of Rhines's trial counsel investigating and presenting mitigation evidence. The court will likewise address these issues together.

For issue IX.A, Rhines's first habeas appeal included the claim that his "counsel failed to investigate his background for mitigation evidence." Brief for Appellant at 34, *Rhines II*, 608 N.W.2d 303 (2000), 1999 WL 34818796. The South Dakota Supreme Court summarily rejected that argument (and several other ineffective assistance claims together), stating:

> Rhines raises several other issues relating to ineffective assistance of counsel in his brief. However, these remaining instances are either conclusions, which are wholly unsupported by the record, or sound trial strategy when judged by the circumstances facing trial counsel at the time of their decisions. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694-95. Therefore, this Court will address the remaining ineffective assistance claims no further than to point out that Rhines has not proven either prong of the ineffective assistance test in regard to these claims. The circuit court's denial of these ineffective assistance issues is affirmed.

*Rhines II*, 608 N.W.2d at 313. Issue IX.B (that counsel's presentation of mitigation evidence was "tepid") and issue IX.I (that counsel failed to hire a mitigation expert) were unexhausted when Rhines filed his federal habeas petition. On remand, Rhines brought those two issues before the Seventh Judicial Circuit of South Dakota, and that court rejected Rhines's arguments. *See* Docket 204-1 at 15-22, 24-25. The circuit court also considered and rejected Rhines's argument that his trial counsel failed to properly perform a mitigation investigation. *See id.* at 15 ("Rhines contends that his trial counsel

failed to properly investigate possible mitigation evidence."). Because the circuit court is the last court to address each of these three claims, it is the last reasoned decision concerning issues IX.A, IX.B, and IX.I.

### 1.    Issues IX.A and IX.B: investigation and presentation of mitigation evidence

#### a.    Mitigation Investigation

Rhines was represented at trial by attorneys Michael Stonefield, Wayne Gilbert, and Joseph Butler. They provided testimony during Rhines's first state habeas proceeding. Stonefield explained that Rhines's taped confessions were "very damning" and "the strongest thing we had going against us" going into the penalty phase of Rhines's trial. Docket 215-11 at 9. While Stonefield agreed that the confessions were the most damaging piece of evidence, he acknowledged "the overwhelming amount of evidence that we had against us" posed a serious obstacle to Rhines's case. HCT at 7.[13] On its review of the record, the circuit court found that trial counsel investigated numerous potential sources for mitigating evidence: "They investigated by talking to Rhines, his family and friends, reviewing his military services records, his schooling, employment history, psychiatric and psychological examinations and found that there was very little mitigating evidence to be found or presented." Docket 204-1 at 6 (citing Docket 215-23 at 6 (affidavit of Wayne

---

[13] "HTC" refers to Rhines's first state habeas corpus transcript. Because there is no correlating docket entry containing the entire transcript, the court will cite to the excerpts that have been docketed when possible.

Gilbert)).[14] For example, Rhines was asked to complete an autobiography that the circuit court observed to be "at best disturbing." *Id.* (citing Docket 215-12 (Rhines's autobiography)).

Regarding Rhines's military career, he joined the military when he was seventeen after dropping out of high school. Rhines's military records indicated that he was jailed, disciplined, and received several Article 15 reprimands "for insubordination, drug use, theft of plastic explosives, and assault with a deadly weapon on a fellow service member." Docket 2014-1 at 16 (citing Docket 215-12; Docket 215-18 at 9-13, 25, 28 (Rhines's Military Records)). Rhines was discharged in 1976 "on less than honorable conditions 4 months before the completion of his enlistment." Docket 204-1 (citing Docket 215-12 at 17, 24). Gilbert testified that he felt "the army records as a whole would not be helpful" to their mitigation case. Docket 215-11 at 17.

After being discharged, Rhines briefly attended college. After burglarizing a dorm room, however, Rhines spent seven months in the state penitentiary. Docket 204-1 at 16 (citing Docket 215-12 at 2). After his release from prison, Rhines began working for an excavation company and was taught how to use dynamite. One day he attempted to explode a grain elevator using dynamite, but one of Rhines's supervisors managed to prevent the explosion from occurring.

In 1979, Rhines was convicted of armed robbery and of being a felon in

_____

[14] For simplicity, this court will cite to the locations of the exhibits as they appear in this court's docket.

possession of a firearm after robbing a liquor store while armed with a sawed-off shotgun. Docket 215-12 at 2-3. He served an eighty-seven month sentence, partially in South Dakota and partially in a Washington state prison. *Id.* at 3, 41-42. In Rhines's autobiography, he noted that it could be "detrimental if the prosecution obtains [his] central file" from the Washington prison. *Id.* at 37. Rhines's file notes a number of disciplinary infractions, including several instances where Rhines was in possession of a weapon. Docket 215-37 at 2-3. Among other events, the file includes a report that Rhines was placed in protective custody after accumulating a drug debt to a prison group known as the "Skins." *Id.* at 13.

After Rhines was released from prison, he reported working numerous odd jobs. Docket 215-12 at 3. He began working for Winchell's Donut House in February of 1987 where he was eventually promoted to a management position. After "discovering payroll checks could be easily altered to any amount," Rhines stole approximately $40,000 from the company. *Id.* at 11. In 1990, Rhines skipped town. In 1991, he began working for Dig'Em Donuts in Rapid City. *Id.* He was fired, however, after a payroll dispute with the owner. Following Schaeffer's murder and the robbery of Dig'Em Donuts in 1992, Rhines moved back to Seattle until he was apprehended.

Rhines was ordered to undergo a psychiatric examination prior to trial. Docket 215-24 at 2 (order for psychiatric examination). Stonefield wrote to Dr. Daniel Kennelly, the examining physician, and asked Dr. Kennelly to "do whatever testing or evaluations you feel are appropriate for your

86

determinations in the areas of competency for trial, mental illness and sanity."
*Id.* at 1. Dr. Kennelly interviewed Rhines and submitted a report. Docket 215-
35. The report briefly discussed Rhines's homosexuality. Rhines reported that
he was suffering from an identity problem stemming from his sexuality while
growing up that persisted until he received counseling in 1978. *Id.* at 1. Rhines
denied promiscuity but stated that he was sexually assertive and at times
sadistic, although only with consenting partners. *Id.* at 2. Dr. Kennelly opined,
however, that Rhines's sexuality was not related to the slaying of Schaeffer. *Id.*
Additionally, Dr. Kennelly found no "history of any symptoms that lead to a
psychotic diagnosis," "no evidence that [Rhines] has experienced any major
mental disorders," and concluded "that no major mental illness can be
diagnosed." *Id.* at 3-5. Dr. Kennelly wanted to review a report from Dr. Arbes,
however, and his own information again. *Id.* at 5.

Dr. Arbes is a psychologist who also examined Rhines. Dr. Arbes had
Rhines complete several tests, such as the Minnesota Multiphasic Personality
Inventory (MMPI) exam, the Million Clinical Multiaxial Inventory (MCMI), the
House, Tree, Person test, the Rorschach Personality Diagnosis Method, and the
Thematic Apperception Test (TAT). Docket 215-27 at 1. Dr. Arbes suspected
Rhines attempted to cast himself in a more negative light during the MMPI and
MCMI exams, which called the accuracy of those test results into question. *Id.*
at 1-2. Dr. Arbes, nonetheless, noted "some signs of cognitive disturbance" and
that Rhines tended to be "depressed and morose." *Id.* at 2-3. Dr. Arbes
suggested diagnoses of generalized anxiety disorder and a "[s]chizotypal

[p]ersonality with prominent schizoid or avoidant traits." *Id.* at 5. After reviewing Dr. Kennelly's and Dr. Arbes's findings, Gilbert and Stonefield did not believe they had discovered any evidence that would serve as useful mitigation evidence. Docket 215-23 at 2; Docket 215-24 at 4.

Rhines's attorneys also reached out to his family and friends. Two of Rhines's sisters agreed to testify on his behalf during the penalty phase of the trial. They told Gilbert, however, that their elderly mother would be unable to take the witness stand or assist in his defense. Docket 215-23 at 2. Gilbert also unsuccessfully tried to persuade Rhines's brother Karl to testify. *Id.* Stonefield attempted to find people living in Rhines's hometown to act as mitigation witnesses as well, but he was unable to find any. *Id.* at 1. Gilbert reviewed discovery from the prosecution and interviewed several of Rhines's acquaintances: Sam Harter, Heather Shepard, and Arnold Hernandez. *Id.* at 2. The defense team did not believe those sources contained any usable mitigation evidence. During Rhines's first state habeas proceedings, Gilbert recalled that they discussed the possibility of Rhines providing an unsworn allocution statement, but Rhines decided against it. Docket 215-11 at 14. Gilbert acknowledged his own belief that Rhines was incapable of showing any remorse. *Id.* at 16.

### b.      Presentation

Stonefield testified at the first state habeas proceeding that one of their primary concerns in mitigation was opening the door to Rhines's criminal past and the fact that Rhines had spent much of his adult life in prison. Docket

215-11 at 6. In order to avoid allowing that evidence in, the defense team decided to have Rhines's sisters testify about growing up with Rhines and their family lives, while avoiding any specifics about past misconduct on Rhines's part. *Id.*

Elizabeth, one of Rhines's older sisters, testified during the penalty phase of Rhines's trial. She was an elementary teacher. Docket 215-3 at 166. She testified that their mother was living with her and that their father had passed away roughly five years earlier. Elizabeth recalled how she and their mother went through some old, personal items and came across Rhines's report cards from elementary school. *Id.* at 168. She explained that his grades were somewhat low and that they contained notes indicating problems with Rhines's attitude and ability to stay on tasks. Elizabeth testified how those kinds of behaviors today would signal that it is time to look at getting a child help, although those were not things that people knew about thirty years ago. *Id.* Elizabeth explained that she and another of Rhines's sisters performed very well in school and that Rhines would have been aware of his relative shortcomings growing up. *Id.* at 171. After Rhines dropped out of high school, he moved in with Elizabeth and her husband. They discussed the possibility of Rhines re-enrolling, but Elizabeth testified that "[w]hen you get through grade school with D's and F's you don't have the skills you need to go into high school." *Id.* at 172.

When Rhines decided to go into the military, Elizabeth recalled asking their father not to let Rhines go because she felt that Rhines had problems and

needed psychological help. Their parents, however, thought Rhines may grow out of whatever problems he had, and his father signed the permission papers to allow Rhines to enlist at age 17. Elizabeth believed that Rhines's time in the military caused him to come home with more problems than he had when he left. *Id.* at 173. She recalled some of the more pleasant memories she had with Rhines and ended her testimony with a plea for the jury to spare Rhines's life.

Jennifer, another older sister, also testified during the penalty phase of Rhines's trial. She identified Rhines as her "baby brother," explained that she was the closest sibling to Rhines in terms of age, and stated that they were very close growing up. *Id.* at 179-80. Jennifer echoed Elizabeth's observations that Rhines struggled in school and that it would not be easy for him to follow in the footsteps of his older sisters who received straight A's. She noted Rhines "had problems paying attention and punctuality and getting work done," and that "he got labeled as the strange one, the loner" in town. *Id.* at 182. Jennifer shared Elizabeth's hope that Rhines would re-enroll in high school after he dropped out and expressed hesitation about Rhines entering the military. She, like Elizabeth, had concerns that Rhines was not prepared for military life and asked their father not to let Rhines enlist. Jennifer felt Rhines had emotional troubles and what she described as "a pain that nobody could touch." *Id.* at 185. Jennifer detected negative changes in Rhines after he enlisted in the military. For example, she observed that he became more withdrawn and less able to communicate with others.

Rhines eventually moved in with Jennifer in Rapid City while he looked

for work. In 1978, Rhines shared with Jennifer for the first time that he was a homosexual. Rhines told his parents, too, who "were very understanding for Midwestern, conservative people and [Jennifer] though they did pretty darn well." *Id.* at 188. Over the years that followed, Jennifer stayed in touch with Rhines. She recalled a time in 1984 when she attempted to convince Rhines to come to Denver, Colorado, a place with "a positive gay community" and a place where Jennifer had a job lined up for Rhines, but he never made the move. *Id.* at 190-91. Like Elizabeth, Jennifer ended her testimony with a plea for Rhines's life.

### c.        Circuit court decision

The circuit court relied on three Supreme Court cases to address Rhines's claims: *Strickland*; *Burger v. Kemp*, 483 U.S. 776 (1987); and *Darden v. Wainwright*, 477 U.S. 168 (1986). Docket 204-1 at 19. As the court observed, not only did these cases deal with ineffective assistance claims, but they were all death penalty cases concerning an attorney's performance during the mitigation portion of sentencing.

In *Strickland*, the Court concluded counsel was not ineffective for failing to investigate and present additional mitigation evidence. *Strickland*, 466 U.S. at 699. Notably, the defendant had provided damaging confessions to the police. *Id.* at 672. The Court explained that counsel had successfully kept out the defendant's criminal history. Additionally, counsel had learned from his conversations with the defendant that additional character and psychiatric evidence would provide little benefit. The attorney, therefore, decided to limit

91

the testimony that would come in during the mitigation phase to the testimony the defendant previously gave at his change of plea hearing. That testimony conveyed that the defendant had financial and emotional troubles. By limiting the evidence in that manner, counsel was able to ensure that contrary character evidence would not come in. Thus, the Court concluded, "[T]here can be little doubt . . . that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment." *Id.* Moreover, even if the Court assumed counsel had acted in a professionally unreasonable manner, it concluded the defendant could not establish prejudice. This was so because the evidence that the defendant claimed should have been presented was either cumulative of evidence already introduced or would have opened the door to unfavorable character evidence. *Id.* at 700.

In *Darden*, counsel was likewise not ineffective for failing to present mitigation evidence arising from the defendant's background. *Darden*, 477 U.S. at 184. The Court observed that attempting to paint the defendant as a non-violent man would have opened the door to evidence of his criminal background. That evidence had not previously been admitted, however, and counsel could reasonably have believed that the evidence would have been damaging. For example, the jury could have learned that the defendant "had been in and out of jails and prisons for most of his adult life." *Id.* at 186 (citation omitted). Similarly, presenting psychiatric evidence would have invited the state to respond with its own psychiatric evidence that showed the defendant had a damaging "sociopathic type personality." *Id.* And if counsel

attempted to portray the defendant as a family man, it would have opened the door to evidence that the defendant spent a weekend with a girlfriend despite the fact that he was married. Thus, the Court concluded that the defendant had not overcome the presumption that counsel's choices were sound trial strategy. *Id.* at 186-87.

In *Burger*, counsel interviewed several potential witnesses but presented no mitigation evidence. *Burger*, 483 U.S. at 788. The defendant claimed that counsel should have called the defendant's mother and a psychologist to testify on his behalf, as well as several other witnesses. The Court concluded counsel acted reasonably, however, noting that the defendant's criminal history presented at the time of the penalty phase was clean. His mother's testimony may have resulted in the introduction of evidence of the defendant's troubled upbringing and of his prior run-ins with police. While those instances may not have been overly damaging, the Court felt it was not unreasonable for counsel to conclude that it would be best to keep that harmful information out. Moreover, the attorney's decision not to have the defendant testify was reasonable because counsel did not feel that the defendant was able to express any remorse. That decision was buttressed by the psychologist who was not called to testify, because the psychologist noted that the defendant may have even bragged about his crimes. *Id.* at 791. Although the defendant provided affidavits of several other parties who could have testified about his troubled upbringing, the Court was not convinced that their testimony would have been uniformly helpful. Some, for example, attested that the defendant had violent

tendencies and that the affiants were aware of the defendant's prior run-ins with the police. The Court observed that counsel "could well have made a more thorough investigation than he did," but ultimately found "a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty." *Id.* at 794.

In this case, after its review of the facts and these cases, the circuit court concluded Rhines's trial counsel acted pursuant to a reasonable trial strategy. Not only did counsel conduct a thorough investigation into Rhines's background, but trial counsel's mitigation strategy was predicated on two pretrial victories: (1) an order *in limine* excluding Rhines's two prior felony convictions for armed robbery; and (2) an order *in limine* preventing the state from introducing evidence related to non-statutory aggravating factors. Docket 204-1 at 16. As counsel acknowledged during the first habeas proceeding, they were concerned about opening the door to Rhines's criminal history and the fact that he had spent the majority of his adult life in prison. The task before them was a difficult one considering the majority of the evidence they uncovered from Rhines's past contained potentially damaging information. By focusing their mitigation case on the testimony of Rhines's sisters, however, they were able to portray a sympathetic and largely unchallenged picture of Rhines's unaddressed academic, sexual, and emotional childhood difficulties while keeping his violent and often criminal past away from the jury's consideration. *Id.* at 19.

The court also addressed Rhines's argument that his attorneys

94

overlooked critical mitigation evidence. Rhines identified several childhood friends and teachers who he believed could have provided helpful testimony on his behalf.[15] Docket 215-32. Those individuals submitted affidavits,[16] but the circuit court did not find their proffered statements helpful to Rhines. *See* Docket 215-14 (affidavit of Kerry Larson); Docket 214-15 (affidavit of Roy Jundt); Docket 215-16 (affidavit of Jerry Brooks); Docket 214-17 (affidavit of Gus Miller). For example, Larson noted that Rhines "was viewed as an intimidating and scary person" in their hometown, and that many people knew that Rhines had tried to blow up the grain elevator. Docket 215-14 at 2. Additionally, Rhines had a reputation around town for being a firestarter and abusive to small animals. *Id.* Jundt was a teacher who had Rhines in two classes while Rhines was in seventh grade. Docket 215-15 at 1. Jundt recalled that Rhines "was defiant to authority and rebellious," and that Rhines did not apply himself to school work. *Id.* Jundt also recalled Rhines's reputation for starting fires and for breaking into businesses around town. *Id.* Brooks was another former teacher. Docket 215-16 at 1. Brooks did not recall any instances where Rhines displayed signs of ADHD or behavioral problems in class, but noted that Rhines had a bad reputation in the community. *Id.* Miller was a co-owner of the excavation company where Rhines was hired and where

---

[15] Rhines's petition asserted that his attorneys could have received helpful testimony from John Fouske, James Mighell, and Connie Royer. Docket 73 at 12. Rhines later acknowledged, however, that he had not identified any testimony from those individuals that he would rely upon. Docket 215-32 at 5.

[16] One of the identified parties, Joyce Bossert, wrote a letter indicating she did not trust her memory enough to sign an affidavit. Docket 215-13 at 1.

Rhines learned to use dynamite. Docket 215-17 at 1. In fact, it was Miller's brother who, to prevent an explosion, removed the blasting caps from the dynamite that Rhines had attached to the grain elevator. Docket 215-17 at 1. And like others, Miller recalled Rhines's reputation for being a firestarter in the community. *Id.* at 2.

The circuit court was also unpersuaded by an affidavit signed by Dr. Dewey Ertz. *See* Docket 215-28. Dr. Ertz is a psychologist who reviewed materials from Rhines's trial, including the reports from Dr. Kennelly and Dr. Arbes. Dr. Ertz also met with Rhines on May 26, 2012, and administered the Wechsler Adult Intelligence Scale-Fourth Edition. *Id.* at 2. Dr. Ertz opined that Rhines showed symptoms of attention-deficit/hyperactivity-disorder (ADHD) and that Rhines had difficulty processing information. The circuit court found that Dr. Ertz's findings would have added little to the defense team's mitigation strategy. Docket 204-1 at 17. Thus, because Rhines could not meet the deficient performance or prejudice prong of *Strickland*, the circuit court concluded that Rhines's ineffective assistance claims failed.

### d.      Federal habeas

Here, Rhines primarily takes issue with the circuit court's determination that his trial counsel proceeded according to sound trial strategy. He points to *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins v. Smith*, 539 U.S. 510 (2003) to support his contention that his attorneys rendered ineffective assistance. These cases, like *Strickland*, *Darden*, and *Burger*, also involved allegations that trial counsel was ineffective during the mitigation phase of a

96

capital trial. They, however, are distinguishable for several reasons.

First, a major reason the district court granted the petitioner's claim for relief in *Williams* was the fact that the Virginia Supreme Court misapplied federal law. The Virginia Supreme Court found that the United States Supreme Court's decision in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), modified the prejudice test set forth in *Strickland*, when it did not. *Williams*, 529 U.S. at 393 ("Nonetheless, the Virginia Supreme Court read our decision in *Lockhart* to require a separate inquiry into fundamental fairness . . . the trial judge analyzed the ineffective-assistance claim under the correct standard; the Virginia Supreme Court did not."). Here, the circuit court did not misconstrue federal law. It correctly observed the general standard for analyzing ineffective assistance claims under *Strickland* and then relied on *Strickland*, *Darden*, and *Burger* for comparative purposes. While Rhines argues that *Williams* and *Wiggens* were controlling and dispositive, the Supreme Court has explained that *Strickland* is the appropriate standard that courts should apply to resolve ineffective assistance claims. *Pinholster*, 131 S. Ct. at 1406-07 (rejecting argument that *Williams*, *Wiggins*, and *Rompilla v. Beard*, 545 U.S. 374 (2005) impose a duty to investigate in every case). Likewise, the Court cautioned against "attributing strict rules to this Court's recent case law." *Id.* at 1408.

Second, the petitioners in *Williams* and *Wiggins* not only alleged that trial counsel failed to conduct a meaningful mitigation investigation, but they pointed out specific, detailed, and often highly prejudicial information that counsel overlooked. In *Williams*, although counsel presented some mitigation

97

evidence, counsel did not present "documents prepared in connection with Williams' commitment when he was 11 years old that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin." *Williams*, 529 U.S. at 370. The district court rejected the argument that counsel's mitigation decision was sound trial strategy, observing that:

> counsel did not fail to seek Williams' juvenile and social services records because he thought they would be counterproductive, but because counsel erroneously believed that " 'state law didn't permit it.' " Counsel also acknowledged in the course of the hearings that information about Williams' childhood would have been important in mitigation. And counsel's failure to contact a potentially persuasive character witness was likewise not a conscious strategic choice, but simply a failure to return that witness' phone call offering his service.

*Id.* at 373 (internal citations omitted). And in *Wiggins*, trial counsel failed to present any evidence on the petitioner's background in mitigation despite his "bleak life history." *Wiggins*, 539 U.S. at 516. That history included:

> petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care

system, Wiggins entered a Job Corps program and was allegedly
sexually abused by his supervisor.

*Id.* at 516-17. Although counsel did perform some investigation, counsel
abandoned it after looking at only minimal information such as a pre-sentence
report containing a one-page account of Wiggins' childhood and a handful of
records from the Maryland Department of Social Services. *Id.* at 523-24.

While Rhines devotes many pages of his brief to criticizing the
methodology his trial counsel employed, he only identifies one piece of
potentially helpful information they allegedly overlooked: Dr. Ertz's opinion.
That opinion was formed approximately twenty years after Rhines's trial, and it
suggested that Rhines showed symptoms of ADHD and a mental processing
disorder. But in addition to combing through Rhines's background and family
history, Rhines's counsel did have him examined for psychiatric and
psychological disturbances, and Stonefield's letter to Dr. Kennelly asked him to
search broadly for mental problems. That those examinations did not reveal the
same opinion that Dr. Ertz only recently reached does not mean that trial
counsel acted unreasonably.[17]

Finally, in *Wiggins*, the Court made the following observation:

Indeed, counsel uncovered no evidence in their investigation to
suggest that a mitigation case, in its own right, would have been
counterproductive, or that further investigation would have been
fruitless; this case is therefore distinguishable from our precedents
in which we have found limited investigations into mitigating

---

[17] It is not clear from Dr. Ertz's affidavit that he, in fact, formally
diagnosed Rhines with ADHD or any other learning disorder. Rather, Dr. Ertz
opined that Rhines showed symptoms of ADHD and at times behaved in a
manner consistent with individuals who have ADHD.

evidence to be reasonable.

*Wiggins*, 539 U.S. at 524. The Court then cited *Strickland*, *Darden*, and *Berger*, as cases where counsel learned, through their investigation, that an additional investigation would be fruitless or that presenting certain evidence that was discovered would be harmful. And that is precisely what Rhines's counsel faced: when delving into his military history, school history, employment history, or social history, they continued to find damaging information about Rhines's criminal past. Like in *Darden*, counsel did not want the jury to know Rhines had been in and out of jails all his adult life. *Darden*, 477 U.S. at 186.

Rhines's counsel conducted a thorough and painstaking investigation into his background. Based on what they uncovered, they determined the best way to proceed in order to keep potentially damaging information from the jury was to present a sympathetic picture of Rhines's life through the eyes of his sisters. The state court applied *Strickland* and concluded Rhines's counsel acted pursuant to a reasonable trial strategy. "The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. Based on this court's review of the record, it answers that question affirmatively. Consequently, Rhines is not entitled to relief on claims IX.A or IX.B.

### 2.    Issue IX.I: failure to hire a mitigation expert

Rhines did not exhaust this claim before filing his federal habeas petition. In Rhines's second state habeas proceeding, the issue was not briefed separately before the circuit court. Nonetheless, the circuit court addressed the

100

claim. Docket 204-1 at 24. The court observed that the function of a mitigation expert is to gather a thorough and comprehensive picture of a defendant's background and records. It concluded that that task had been performed by Rhines's trial counsel, noting the mitigation expert "would have interviewed the same friends, family, teachers, employers and reviewed the same records including the autobiography of Rhines, as his attorneys did." *Id.* at 25.

*Strickland* acknowledged that an investigation itself is not necessary in every case. *Strickland*, 466 U.S. at 691. What is required is that counsel's actions be reasonable. The circuit court concluded Rhines's counsel did not act unreasonably, given the extensive investigation that had already taken place. At the very least, a reasonable argument supports the notion that Rhines's counsel satisfied the *Strickland* standard. Therefore, Rhines is not entitled to relief on this claim.

### B.   Was trial counsel ineffective by presenting a "tepid" mitigation case?

The court has included its analysis and resolution of this issue in its discussion of issue IX.A, *supra*. For the reasons stated therein, Rhines is not entitled to relief on this claim.

### C.   Was trial counsel ineffective for failing to inform the jury of Rhines's willingness to plead guilty or not giving Rhines an opportunity to allocute?

Related to Rhines's mitigation arguments is the argument that his attorneys should have informed the jury that Rhines offered to plead guilty in exchange for a life sentence and should have allowed him to offer an allocution

statement. These claims were raised in Rhines's first habeas appeal. *See* Brief for Appellant at 30-33, *Rhines II*, 608 N.W.2d 303 (2000), 1999 WL 34818796. And like his mitigation arguments, these arguments were summarily rejected by the South Dakota Supreme Court as sound trial strategy. *Rhines II*, 608 N.W.2d at 313. The circuit court mentioned counsel's reasons for not presenting an allocution statement, Docket 204-1 at 17, 19, but did not specifically address the ineffectiveness issue. Rather, the court ultimately concluded, as the South Dakota Supreme Court did in *Rhines II*, that the attorneys acted pursuant to sound trial strategy. While Rhines himself does not specify which decision he is challenging, this court will assume the circuit court's decision was the last reasoned decision on the matter.

There is no constitutional right to allocution. *Hill v. United States*, 368 U.S. 424, 428 (1962) ("The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus."). An attorney's decision to present an allocution statement or otherwise inform the jury of a defendant's willingness to accept his or her responsibility may be an element of trial strategy. *See Burger*, 483 U.S. at 791 (noting the attorney thought "it would be unwise to put petitioner himself on the witness stand" because the "petitioner never expressed any remorse."); *see also Williams*, 529 U.S. at 369 (observing "counsel repeatedly emphasized the fact that Williams had initiated the contact with the police[.]").

In Rhines's first state habeas proceeding, Stonefield noted that the

defense team pursued a possible plea agreement where Rhines would plead guilty in exchange for a life sentence. Docket 215-11 at 5. The response they received, however, was that "it wasn't going to happen." *Id.* Stonefield recalled that the attorneys discussed having Rhines provide an allocution statement, but he was concerned about opening Rhines up to cross-examination. HTC at 39. Gilbert testified that the trial team discussed the possibility of Rhines making an unsworn allocution statement, but "[Rhines] decided that he did not want to do that." Docket 215-11 at 14. Gilbert also noted a concern about putting Rhines on the stand and subjecting him to cross-examination. *Id.* at 16. Gilbert further believed that Rhines was incapable of showing remorse. *Id.* During Rhines's second state habeas proceeding, Gilbert submitted an affidavit that confirmed his earlier testimony:

> I discussed with Charles the possibility of him giving his own allocution at sentencing. As we talked, I felt that Charles' allocution would not be convincing, and advised Charles of my opinion. It is my recollection that the defense team discussed an unsworn allocution, and that Charles agreed that having him allocate was not going to work.

Docket 215-23 at 2.

Neither state court decision expounds on the trial team's decision not to present evidence of Rhines's willingness to accept responsibility for his crimes. Both courts concluded by summary adjudication that Rhines's allegations did not establish a violation of *Strickland*. Rhines's counsel was aware of, and did in fact consider putting on, evidence that Rhines was willing to accept responsibility for his crimes. And they concluded that the evidence should not

be presented because it would not be credible or helpful. Gilbert himself believed that Rhines was incapable of showing remorse in the event an allocution statement would be presented. Likewise, informing the jury that Rhines was willing to take a plea agreement would have invited a response from opposing counsel that Rhines was willing to do so only if ensured that his life would be spared. Thus, the court finds that a reasonable argument supports the conclusion that the trial team's decision to refrain from presenting this evidence met the *Strickland* standard. Consequently, Rhines is not entitled to relief on this claim.

### D.  Was trial counsel ineffective for failing to exclude evidence of Rhines's homosexuality?

Rhines raised this issue in his first habeas appeal. Brief for Appellant at 29-30, *Rhines II*, 608 N.W.2d 303 (2000), 1999 WL 34818796. The South Dakota Supreme Court summarily rejected the argument. *Rhines II*, 608 N.W.2d at 313. Thus, the South Dakota Supreme Court's conclusion in *Rhines II* is the last reasoned decision on the matter. That the court's opinion is a summary dismissal does not change the fact that it is a decision on the merits of Rhines's claim. *Harrington*, 562 U.S. at 98 (noting the habeas petitioner must still show there is "no reasonable basis for the state court to deny relief.").

Each of Rhines's attorneys brought up the subject of his homosexuality during *voir dire*. *See* Docket 215-11 at 3. When asked why during Rhines's first habeas proceeding, Stonefield explained:

> Because as I see it, it was something that – it was an issue that
> was going to come out during the course of the trial. I don't think

there was any question that, if not explicitly, there was at least
going to be an implication or an inference that Charles is a
homosexual. And I didn't think that I – and I don't think any of the
others thought either that it was something we needed to hide. I
think if we had not raised it as an issue, the potential
consequences – well, potentially you run the risk of getting
someone on your jury who hasn't discussed this issue and who,
when they find out about it, becomes hostile to you. That's why it
came up. I mean, that's why we felt it was necessary to bring up.

*Id.* at 3-4. For example, Stonefield noted that Rhines was in a romantic

relationship with his roommate, Sam Harter, who was also a potential witness.

*Id.* at 13. Although Harter ultimately was not called as a witness, Stonefield

explained that he "certainly expected" that Harter was going to testify. HTC at

16; *see also id.* at 106 (noting that relationship was "part of the reason why we

brought up the issue" of Rhines's sexuality). When asked whether the attorneys

talked to Rhines about bringing up the issue of his sexuality, Stonefield replied,

"I don't recall Charles having any great objection to this topic being brought

up." Docket 215-11 at 12. Gilbert acknowledged he believed that potential

witnesses aside from Harter would make reference to Rhines's sexuality. HTC

at 115. Gilbert also viewed the *voir dire* questioning as a way to weed out

potential jurors who might be hostile to Rhines because of his sexuality. *Id.* In

retrospect, Gilbert harbored suspicion that some of the jurors may not have

honestly answered questions about Rhines's sexuality, although he explained

"[t]here's always that question in a criminal case." *Id.* at 157. Butler similarly

noted that Rhines agreed with the decision to bring up his sexuality. Docket

215-11 at 20. When asked why the attorneys thought the issue should be

brought up in *voir dire*, he explained that "it would tend to possibly explain

that he was a little bit different than some of the other people. That might tend to have a mitigating [effect]." *Id.* Rhines points to the incongruity between Stonefield and Gilbert's rationale and Butler's rationale for bringing up his sexuality. He also argues that there could be no sound trial strategy because the attorneys' responses indicate that they did not agree on the strategy.

While no explicit analysis from the South Dakota Supreme Court is available, this court concludes that the South Dakota Supreme Court did not unreasonably apply *Strickland*. First, the rationales provided by each of Rhines's attorneys are not mutually incompatible with each other. For example, both Stonefield and Gilbert believed that Rhines's sexuality would ultimately come in through witnesses at trial. Thus, bringing up Rhines's sexuality during *voir dire* would be a way to identify potential jurors who might react with hostility to such knowledge. And both Stonefield and Butler recalled that Rhines agreed to bring up the issue. Second, even if the variances in the attorneys' rationales were enough to overcome the first *Strickland* prong,[18] Rhines has not made any showing of prejudice. Although Gilbert believed that some of the jurors may not have answered their questions honestly, Rhines offers no evidence that that in fact happened here. Thus, Rhines is not entitled to relief on this claim.

### E.   Was trial counsel ineffective for improperly handling a jury note regarding the conditions of life imprisonment?

As discussed in conjunction with issue VII.E, *supra*, the South Dakota

---

[18] Rhines has offered no clearly established federal law establishing such a rule.

Supreme Court found that Rhines's future dangerousness was not put into issue. *Rhines II*, 608 N.W.2d at 311. This court concluded that that determination was not objectively unreasonable. In conjunction with issue VII.E, Rhines also alleged his attorneys rendered ineffective assistance of counsel responding to a jury note that asked about life imprisonment without parole. More specifically, Rhines argued that his counsel should have appealed the trial court's refusal to answer the jury's questions under *Simmons v. South Carolina*, 512 U.S. 154 (1994). The South Dakota Supreme Court rejected that argument. *Rhines II*, 608 N.W.2d at 311. This court found no error with the instruction as given by the trial court, but reserved addressing the South Dakota Supreme Court's rejection of Rhines's ineffective assistance of counsel claim for here.

Rhines does not contend that the South Dakota Supreme Court's denial of his ineffective assistance claim as presented was contrary to or an unreasonable application of clearly established federal law. Rather, Rhines converts the ineffective assistance claim he did assert in state court into an issue that was not asserted. Rhines's new issue is that his attorneys were ineffective because they opened the door to the state's future dangerousness argument, and they failed to properly cure their error when given the chance. The Supreme Court has long recognized, however, that a petitioner cannot "rais[e] one claim in the state courts and another in the federal courts." *Picard v. Connor*, 404 U.S. 270, 276 (1971).

To the extent that this ineffective assistance argument was presented

107

and resolved against Rhines, this court concludes such a resolution is not an unreasonable application of the *Strickland* standard. First, because Rhines's future dangerousness was not presented to the jury, Rhines cannot demonstrate prejudice. Even if Rhines's attorneys improperly invited the state to put his future dangerousness into issue, the state's refusal to take the bait could not have prejudiced Rhines. Second, Rhines acknowledges that his attorneys submitted a more detailed jury instruction regarding life imprisonment than the one given by the trial court. The substance of that proposed instruction was to instruct the jury not to speculate on the possibility that his death sentence would be commuted or on the possibility that he may later be released even if he were sentenced to life imprisonment without parole. The court refused this language. Rhines does not explain what more his counsel should have done. Moreover, this court has concluded that the instruction as given by the trial court was proper. Therefore, Rhines again has demonstrated prejudice. Consequently, Rhines is not entitled to relief on this issue.

**F.    Was trial counsel ineffective by disproportionately delegating defense work to third-chair counsel?**

Rhines combines his arguments on issues IX.F and IX.G together. The court will do the same, and these issues are discussed in issue IX.G, *infra.*

**G.    Was trial counsel ineffective due to mental and moral shortcomings and expressing a favorable view of the death penalty?**

In his first habeas appeal, Rhines argued that Gilbert was suffering from

108

depression and that Gilbert had misappropriated an unspecified sum of money while he represented Rhines. Brief for Appellant at 27-28, *Rhines II*, 608 N.W.2d 303 (2000), 1999 WL 34818796. He asserted that Gilbert's personal problems caused a lot of work to be shifted to Stonefield. *Id.* at 27. Rhines also argued that Butler improperly told the jury during closing arguments that the death penalty was an appropriate punishment in certain cases. *Id.* at 26-27. Rhines's claims were summarily rejected by the South Dakota Supreme Court. *Rhines II*, 608 N.W.2d at 313.

Here, Rhines acknowledges these claims would not constitute ineffective assistance of counsel. Rather, he asserts that they should be considered in combination with his other ineffective assistance claims. For the reasons stated both *supra* and *infra*, this court rejects each of Rhines's other ineffective assistance claims. As a corollary, this court concludes Rhines is not entitled to relief on this claim as well.

### H.   Was trial counsel ineffective for failing to exclude or challenge testimony from Glen Wishard?

This claim was not exhausted when Rhines filed his federal habeas petition. It was addressed for the first time by the circuit court in Rhines's second habeas proceeding. Docket 204-1 at 22-24. Because the South Dakota Supreme Court denied Rhines's motion for a certificate of probable cause without addressing any of his arguments, the state circuit court is the last reasoned decision addressing this claim.

Wishard was a baker and an employee of Dig'Em Donuts. He was called

109

to testify during the state's case-in-chief. *See* Docket 215-3 at 131-138.
Wishard explained that he went into work at the Dig'Em Donuts store located
in Box Elder on March 8, 1992. Schaeffer was murdered that night at the West
Main Street location in Rapid City. According to Wishard, he began his shift at
10:00 that evening and worked overnight. Around 2:00 a.m., Wishard learned
from Dennis Digges, a co-owner of Dig'Em Donuts, that Schaeffer had been
killed.

Rhines arrived at the Box Elder store with Sam Harter, his roommate,
sometime after Dennis Digges spoke with Wishard. Wishard was asked if he
could recall Rhines's appearance at this time. He testified that Rhines appeared
to be "cheerful." *Id.* at 137. Wishard recounted how Rhines told him that he
had just been questioned by the police because Rhines was a former Dig'Em
Donuts employee. When asked if Rhines appeared to be concerned about being
questioned, Wishard responded, "No, he was very cheerful." *Id.* On cross-
examination, Stonefield asked Wishard when he first told the police about the
events that formed the substance of his testimony. Wishard stated that he first
spoke to the police in September. Stonefiled reiterated: "So the incidents that
you testified about occurred in March and you contacted [the police] about in
September?" *Id.* at 138. Wishard responded, "That's right." *Id.* Stonefield stated
that he had no further questions.

Rhines argued that his trial counsel were ineffective because they did not
object to or rebut Wishard's testimony about Rhines's appearance. Rhines
claimed that he told his attorneys that Wishard's testimony was false and that

Wishard had his dates mixed up.

During Rhines's first state habeas proceeding, Stonefield was asked about Wishard's testimony. He was asked if Rhines told him that Wishard was lying. Stonefield responded, "If I remember right, I think Charles said something about disputing what – about what that man was saying, yeah, that sounds – that sounds familiar." HTC at 53. Stonefield added that "if I remember right, what the dispute was about was – was demeanor, was how Charles was acting or how Sam was acting, that kind of thing." *Id.* at 54. Stonefield was asked if Rhines told him that Wishard had his nights mixed up, and Stonefield responded, "He may very well have said that. That sounds familiar." *Id.*

The circuit court reviewed Stonefield's and Butler's responses to questions about cross-examining a number of state witnesses, including Wishard. They both expressed agreement with the sentiment that cross-examination should be pursued if the examiner has a point to make. Docket 204-1 at 23. The court determined that Stonefield's cross-examination was part of the defense team's trial strategy. It also concluded that, given the overwhelming body of evidence against Rhines, he could not demonstrate prejudice.

Although not elaborated upon by the circuit court, its finding regarding trial strategy appears to be that by highlighting the several months that lapsed between Wishard's observations and the time he spoke to police, Stonefield was underscoring the point that Wishard's memory was not trustworthy. Moreover,

111

in contrast to Rhines's suggestion that Wishard had his dates mixed up, Wishard testified that he spoke with Dennis Digges on March 9 about Schaeffer's murder shortly before Rhines arrived. Wishard also testified how Rhines told him that he had just been questioned by the police about the murder. The fact that Wishard learned of Schaeffer's murder on the same day that Rhines told Wishard he had just been questioned by the police about the murder shows that Wishard was not, as Rhines suggests, thinking of an earlier meeting. Although Rhines suggests that Wishard's report of his demeanor must have been from a different time, Rhines asserts that position only by speculation. And to some degree, Rhines's counsel did draw the jury's attention to the possible inaccuracy of Wishard's memory through cross-examination. Finally, Rhines's refutation of the court's prejudice determination consists only of conclusory language. Thus, the court finds that at least a reasonable argument supports the conclusion that Stonefield's cross-examination of Wishard complied with the *Strickland* standard. Consequently, Rhines is not entitled to relief on this claim.

## I.   Was trial counsel ineffective for failing to hire a mitigation expert?

The court has included its analysis and resolution of this issue in its discussion of issue IX.A, *supra*. For the reasons stated therein, Rhines is not entitled to relief on this claim.

## J.   Was trial counsel ineffective for failing to exclude testimony concerning Rhines's possession of a gun and his conduct at victim's funeral?

This claim was not exhausted when Rhines filed his federal habeas petition. Rhines raised the issue in his second state habeas proceeding, but he did not brief or present any argument in support of it. Docket 204-1 at 15. Consequently, the circuit court summarily rejected the claim. *Id.*

As a threshold matter, Rhines's failure to support this argument at all in state court suggests this claim was not "fairly presented" to the court for resolution. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). Giving Rhines the benefit of the doubt, this court will assume the state court's summary disposition of Rhines's argument is a determination on the merits that Rhines did not satisfy the *Strickland* test for ineffective assistance of counsel. *See Harrington*, 562 U.S. at 98 (noting the habeas petitioner must still show there is "no reasonable basis for the state court to deny relief.").

### 1.    Rhonda Graff

Rhonda Graff was called as a witness during the state's case-in-chief. Docket 215-3 at 79-85. She was a resident in the same apartment complex where Rhines and Harter lived. Aside from the occasional greeting in passing, Graff did not have much contact with Rhines prior to March 9, 1992–the day after Schaeffer's murder. Graff testified that she and her father were speaking to Rhines that morning. They asked Rhines about the incident at Dig'Em Donuts. Rhines told Graff that he had known Schaeffer and that Harter was the one that found his body. Rhines then drew a map of the store in the snow and indicated where Schaeffer had been found.

Graff asked if the police knew who committed the murder. Rhines said

that they did not. Rhines knew, however, "exactly how many times [Schaeffer] had been stabbed . . . he knew the exact number and where." *Id.* at 82. Specifically, Rhines said Schaeffer had been stabbed "twice in the front and once in the back with his hands tied behind his back." *Id.* Graff found this striking because the news reports did not state how many times Schaeffer had been stabbed, but Rhines did. Graff also recalled that Rhines made a reference to Schaeffer having vacation plans, and that "if he would have stayed away like he said, on his vacation . . . and not come back early and went to work, he would have still been alive." *Id.* at 84. Graff noted that Rhines would periodically attempt to change the subject during their conversation.

Graff recalled seeing Rhines on March 10, the following day. She testified that she saw Rhines and Harter on the front porch of their apartment "handling firearms of some caliber." *Id.* at 83. She recalled that they went inside, however, and Graff did not elaborate on what she observed. Graff testified that she saw Rhines leave home in a suit on March 11, presumably to attend Schaeffer's funeral. After Rhines came home, Graff saw him get into his car and leave. She testified that was the last time she saw Rhines.

Here, Rhines argues that Graff's reference to the fact that she observed him handling a firearm was irrelevant and highly prejudicial. He argues it was irrelevant because whether he handled a firearm was of no consequence to his guilt nor any statutory aggravating factor. He also asserts her testimony was prejudicial because it suggested he was prone to violence. Thus, his attorneys' failure to object could not constitute sound trial strategy. The court concludes,

114

however, that Rhines has failed to show the absence of a reasonable basis for the state court to deny him relief.

First, whether Rhines possessed the handgun is arguably relevant to the issue of guilt and Rhines's own knowledge of his guilt. By the time Graff observed Rhines in possession of a firearm, Rhines had already provided her with specific details of Schaeffer's murder that were not publically known. The jury could infer that Rhines was arming himself to prepare to avoid arrest. This is bolstered by the fact that Rhines fled the following day. Second, even if the statement was irrelevant and should have been objected to, Rhines has not demonstrated prejudice by its admission sufficient to undermine the confidence in the outcome of his trial. Graff merely mentioned the fact that Rhines owned a gun without further elaboration. She recounted how she observed Rhines with Harter the day after she first spoke with Rhines, and she was able to provide specific details about Rhines's conduct that supported the veracity of her recollection. Moreover, had his attorneys objected to her statement about the firearm, such an objection could have drawn even more attention to the fact that Rhines possessed a gun. At a minimum, the court finds that at least a reasonable argument supports the conclusion that the trial team's decision to refrain from objecting to this evidence complied with the *Strickland* standard.

### 2.   Connie Royer

Royer was called as a witness immediately after Graff. Docket 215-3 at 85-93. Royer was a co-owner of Dig'Em Donuts along with Dennis and Donna

Digges. She was very close to Schaeffer and knew him before the donut shop opened. Royer recalled the last conversation she had with Schaeffer and that Schaeffer said he would be going out of town. Royer testified that she received word of the murder around 10:30 p.m., and that she came straight to the donut shop. Royer also testified that she knew Rhines as a former employee but that he had been fired. She explained that she went to Schaeffer's funeral on March 11, and that she saw Rhines there. Royer recalled that she was crying and that Rhines came up and put his arm around her. Rhines told her, "Connie, it will be all right. This is where he should be. He's in God's hands now." *Id.* at 215-3.

Like Rhines's objection to Graff's testimony, Rhines asserts that Royer's testimony about his behavior at the funeral was irrelevant. Likewise, he contends that his counsel should have objected to it and that their failure to do so was in violation of the *Strickland* standard of effective representation. Again, however, the court finds there is a reasonable basis to support the rejection of Rhines's ineffective assistance claim.

First, Rhines's statement to Royer at the funeral could suggest a lack of remorse or an inability to accept responsibility for his actions. Second, to the extent Royer's testimony was irrelevant, Rhines cannot demonstrate prejudice by its admission. The attitude Rhines displayed toward Schaeffer's death during the funeral was consistent with the attitude he demonstrated in his interview with Allendar and Bahr. *Rhines I*, 548 N.W.2d at 452 (observing "Rhines described his own sarcastic and scornful attitude toward Shaeffer's

116

suffering"); Docket 215-2 at 6 (laughing and explaining "Too bad [the pathologist] wasn't there" to watch Schaeffer's final moments). This taped interview was played for the jury. Thus, like with Graff's testimony, at least a reasonable argument supports the conclusion that trial team's decision to refrain from objecting to this evidence complied with the *Strickland* standard. Consequently, Rhines is not entitled to relief on this claim.

## X.    Did the South Dakota Supreme Court Fail to Perform its Proportionality Review?

As discussed in issue VI.D, *supra*, the Supreme Court in *Gregg* expressed a favorable view of the mandatory appeal mechanism enacted in Georgia. That procedure required the state supreme court "to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases." *Gregg*, 428 U.S. at 198. South Dakota enacted a similar requirement. SDCL 23A-27A-12. The South Dakota Supreme Court followed that procedure in Rhines's direct appeal. *Rhines I*, 548 N.W.2d 453-58. It concluded: (1) that Rhines's death sentence was not imposed under the influence of passion, prejudice, or another arbitrary factor, *id.* at 455; (2) that the evidence supported the jury's finding of at least one statutory aggravating factor, *id.*; and (3) after comparing seven cases where the jury reached the penalty phase of a capital trial, that Rhines's sentence was not disproportionate. *Id.* at 456-58. Also discussed in issue VI.D,

*supra*, was Rhines's challenge to the South Dakota Supreme Court's determination of the pool of similar cases it used to compare to Rhines's case for proportionality purposes. For the reasons previously stated in issue VI.D, *supra*, Rhines's challenge here to the South Dakota Supreme Court's proportionality review fails.

Rhines also argues that the South Dakota Supreme Court ignored information suggesting his death sentence was imposed based on passion, prejudice, or some other arbitrary factor. Rhines does not identify what evidence the Court ignored. On direct appeal, the South Dakota Supreme Court rejected Rhines's argument that the jurors' bias against him was made manifest by the jury note asking about life in prison. *Rhines I*, 548 N.W.2d at 453-54. The Court rejected that argument, noting "[p]rison life was an appropriate topic for discussion when weighing the alternatives of life imprisonment and the death penalty." *Id.* at 454. And the Court also observed:

> Nor can we conclude the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We have rejected Rhines' claims that inadmissible evidence was considered by the jury and that the jury permitted irrelevant facts to taint its verdict. We cannot discern any independent basis for invalidating the jury's sentence. Although Rhines presented mitigating evidence concerning his difficult youth and loving family, the decision to impose the death penalty in spite of this evidence was not arbitrary. Rhines brutally murdered Donnivan Schaeffer so he could steal less than $2,000 in cash and escape responsibility for his crime. The law permits mercy, but does not require it.

*Id.* at 455.

The burden is on Rhines to demonstrate why he is entitled to habeas

118

relief. But Rhines has not elucidated what additional information the South Dakota Supreme Court allegedly ignored. He has neither explained how the South Dakota Supreme Court's decision was contrary to or involved an unreasonable application of clearly established federal law, nor has he explained why the Court's adjudication of this issue was based on an objectively unreasonable determination of the facts. Consequently, Rhines is not entitled to relief on this claim.

## XI.   Did the Trial Court Improperly Deny Rhines's Motion to Appoint a Forensic Communications Expert?

On direct appeal, Rhines argued that the trial court abused its discretion when it denied his motion to appoint a forensic communication expert. *Rhines I*, 548 N.W.2d at 441; *see* SDCL 19-19-706(a) (providing authority for a trial court to appoint experts when "the court deems expert evidence is desirable").[19] According to Rhines, such an expert should have been appointed "to conduct and analyze a community attitude study and design a supplemental juror questionnaire[.]" *Rhines I*, 548 N.W.2d at 441. Rhines was concerned that the jurors could be unfairly influenced by his homosexuality, and explained the expert's study and juror questionnaire were necessary to properly address the issue.

To support his argument on direct appeal, Rhines pointed to the juror note inquiring about prison life. Among the questions presented, the jurors asked:

---

[19] This provision has been recently relocated from SDCL 19-15-9.

119

Will Mr. Rhines be allowed to mix with the general inmate
population?

Will Mr. Rhines be allowed to discuss, describe or brag about his
crime to other inmates, especially new and or young men jailed for
lesser crimes (Ex: drugs, DWI, assault, etc.)?

Will Mr. Rhines be allowed to marry or have conjugal visits?

Will Mr. Rhines be jailed alone or will he have a cell mate?

*Id.* Rhines argued that these questions demonstrated homophobic concerns

that prejudiced the jury's deliberations.

The South Dakota Supreme Court disagreed for several reasons. First, it

found that there was no necessity for the type of expert services Rhines

requested. Rather, the Court concluded that *voir dire* was an appropriate

vehicle for determining juror hostility, and the court found that an impartial

jury had been impaneled. *Id.* at 442. It noted that counsel questioned eleven of

the twelve jurors about Rhines's sexuality, and observed that ten responded it

would have no impact on their decision making. The eleventh thought

homosexuality was sinful, but nonetheless stated that Rhines's sexuality would

not affect how she decided the case. Second, the Court disagreed that the juror

note revealed any homophobic bias on the part of the jurors. Rather, the Court

found that the jurors' questions related to prison life and prison conditions

rather than Rhines's sexual orientation. *Id.* For example, other questions the

jurors posed were focused on whether Rhines would be eligible for work

release, whether he could attend college, whether he would be able to watch TV

or listen to the radio, and what his daily routine would be like. The Court

determined that, in context, this series of questions reflected "the jury's legitimate efforts to weigh the appropriateness of life imprisonment versus the death penalty." *Id.* Thus, the South Dakota Supreme Court found no error in the trial court's refusal to appoint an expert.

Here, Rhines's claim for relief derives from *Ake v. Oklahoma*, 470 U.S. 68 (1985). In *Ake*, the defendant exhibited signs of a mental illness "so bizarre that the trial judge, *sua sponte*, ordered him to be examined by a psychiatrist" to determine if he could stand trial. *Id.* at 70. The defendant was committed to a state hospital, and it was determined that he was not competent to stand trial. Six weeks later, the court was informed by the chief forensic psychologist that Ake would be competent to stand trial if he continued to receive daily doses of an anti-psychotic drug.

At a pretrial proceeding, Ake's attorney gave notice that he would raise an insanity defense. *Id.* at 72. The attorney asked the court to appoint a psychiatrist to examine Ake and to determine if he was incompetent *at the time of the offense*, because none of the psychiatrists who had examined Ake had explored that issue. He also noted that Ake was indigent and asked for the funds to hire an expert if the court would not appoint one. The trial court refused, finding no constitutional requirement to fulfill the attorney's request. Ake was subsequently tried for and convicted of murder, and sentenced to death. The state appellate court upheld the sentence.

The United States Supreme Court reversed. It held "that when a defendant has made a preliminary showing that his sanity at the time of the

offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.* at 74.

Rhines reads *Ake* as a broad requirement that the government must provide an indigent defendant with expert assistance whenever that expertise would be relevant to any so-called "substantial factor" of the indigent's defense. Rhines reiterates his concern that the jury might have been hostile toward him based upon his homosexuality and that the forensic communications expert could have helped prepare trial counsel for addressing the issue. He contends that the jury questions demonstrated that his sexuality was a "substantial factor" in his case and that the expert was a necessity. Rhines concludes that the South Dakota Supreme Court's decision, therefore, was contrary to or involved an unreasonable application of *Ake*.

This court disagrees. First, the defense at issue in *Ake* was insanity. Unlike Rhines's sexuality, a defendant's sanity implicates his or her capacity to comply with the law. If the defendant is insane at the time an offense is committed, his or her lack of sanity at that time is a defense to otherwise criminal conduct. *Cf. United States v. Voice*, 627 F.2d 138, 146 (8th Cir. 1980). As the Court in *Ake* observed, the defendant had placed his sanity in issue; thus his argument was that he could not be held criminally responsible for the conduct with which he was charged. And despite having the burden of proving that he was insane, he had no means to marshal such evidence in the absence of a court appointed expert. *Ake*, 470 U.S. at 72. By contrast, Rhines's

sexuality is not a defense to Schaeffer's murder or the burglary of the donut shop. The Court's holding in *Ake* is congruent with its recognition of the uniquely "elusive and often deceptive" symptoms of mental illness that only an expert can help define, and the unfairness that inures "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer" without affording him any means to mount a meaningful defense on that issue. *Id.* at 80 (internal quotation omitted). The Court observed that "[a] defendant's mental condition is not necessarily at issue in every criminal proceeding, however, and it is unlikely that psychiatric assistance of the kind we have described would be of probable value in cases where it is not." *Id.* at 82. Thus, the Court's holding was limited to the issue of appointing a psychiatrist in those cases where the defendant's mental capacity was put in issue. That the Court's holding in *Ake* was limited in such a manner is stated expressly by the Court when it reiterated that

> when a defendant demonstrates to the trial judge that his sanity at
> the time of the offense is to be a significant factor at trial, the State
> must, at a minimum, assure the defendant access to a competent
> psychiatrist who will conduct an appropriate examination and
> assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83.

Moreover, Rhines has not identified any clearly established federal law expanding the express holding of *Ake* to encompass the appointment of experts in other cases generally nor, more specifically, in those cases where a defendant's sexuality is, in Rhines's view, a "significant factor" to his general defense strategy. Thus, the South Dakota Supreme Court's decision was not

contrary to clearly established federal law, nor was it an unreasonable application of that law.

Finally, Rhines disagrees with the South Dakota Supreme Court's determinations that the expert he desired would not be necessary to his case, that *voir dire* was effective in impaneling an impartial jury, and that the jury questions focused on prison conditions and not Rhines's sexuality. Reviewing the court's resolution of those factual issues, this court finds that the South Dakota Supreme Court's determinations were not objectively unreasonable. Consequently, Rhines is not entitled to relief on this issue.

## XII.   Did the Prosecutor Engage in Misconduct?

Rhines alleges four grounds of prosecutorial misconduct. These arguments were not exhausted when Rhines filed his federal habeas petition. They were addressed for the first time by the state circuit court in Rhines's second habeas proceeding. Docket 204-1 at 25-30. Because the South Dakota Supreme Court denied Rhines's motion for a certificate of probable cause without addressing any of his arguments, the state circuit court is the last reasoned decision addressing these issues.

In *Darden*, 477 U.S. at 181, the United States Supreme Court addressed the standard applicable to habeas claims of prosecutorial misconduct. To be entitled to relief, Rhines must not only demonstrate that the prosecutor's comments were improper but also that those comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court has

explained that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). This test, however, "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations[.]' " *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### A. Did the prosecutor improperly argue that Schaeffer's hands were tied prior to his death?

Rhines asserts that the prosecuting attorney misstated the evidence during closing arguments and improperly told the jury that Schaeffer's hands were tied prior to his death. The prosecutor did not mention the issue until the penalty phase of Rhines's trial. Describing the effect of the third stab wound, the prosecutor stated: "He goes limp. It's over and whether or not he tied him up before or after is for your determination." TT 2662.[20] And in rebuttal, when the prosecutor was addressing defense counsel's argument about the deterrent effect of the death penalty, he stated:

> But wouldn't you like to think for just a moment that the next time a convenience store or donut shop has this sort of thing happen, that the person who does it realizes that no matter whether you stab him once or twice or you bind him and you stab him in the head or you mutilate him, that at some point in time you just don't get by with just a life sentence? Might there not be some deterrence here?

*Id.* at 2693.

The circuit court observed that Dr. Habbe–the state's pathologist–was

---

[20] "TT" refers to Rhines's trial transcript. Like Rhines's habeas transcript, there is no docket entry containing the entirety of this transcript.

unsure whether the ligature was tied before or after Schaeffer's death. It also observed that the prosecuting attorney explained that whether or not Schaeffer's hands were bound prior to his death was for the jury to determine. And it referenced the South Dakota Supreme Court's conclusion in *Rhines I* that the jury could reasonably infer from the evidence presented at trial that Schaeffer's hands were bound prior to his death. For those reasons, the circuit court found no prosecutorial misconduct occurred. *See* Docket 204-1 at 27.

As explained in issue VIII.B, *supra*, this court concluded that the South Dakota Supreme Court's determination regarding the evidence presented at trial was not objectively unreasonable. A juror could have inferred from the evidence that Schaeffer's hands were tied before his death. Additionally, in the prosecutor's first reference to the binding, he explicitly told the jury that whether Schaeffer's hands were bound prior to his death was for them to determine. In the second reference, he spoke of the binding in hypothetical terms. Contrary to Rhines's assertion, the prosecutor did not misstate the evidence presented at trial nor did he tell the jury that Schaeffer's hands were bound prior to his death. The circuit court's findings were not objectively unreasonable, and its conclusion that no prosecutorial misconduct occurred was not contrary to nor did it involve an unreasonable application of clearly established federal law. Thus, Rhines is not entitled to relief on this claim.

**B.  Did the prosecutor improperly argue that Schaeffer was "gutted?"**

Rhines asserts that the prosecutor improperly told the jury that Rhines

126

"gutted" Schaeffer when the prosecutor described the manner in which Schaeffer was killed. The prosecutor's statement is based on the testimony of Dr. Habbe.

Dr. Habbe performed an autopsy of Schaeffer. Certain photographs taken during the autopsy were introduced into evidence. Regarding the first stab wound, Dr. Habbe testified:

> This wound measured, width-wise, from a point down here to a point up here measured a little under one and a half inches. The interior part of the wound here has a blunt margin to it and the superior part of the wound has a sharp, pointed appearance to it. Coming from the tip of this wound is a superficial, and I think you can see part of it right here, what would be called an incised wound coming extending all the way up to right here. From here to here this wound is very superficial and barely breaks through the skin.

TT at 2218-19. The prosecutor continued to question Dr. Habbe as follows:

> Q:    With respect to that wound you said the blunt portion was on the bottom?
>
> A:    Right there.
>
> Q:    And the sharp portion was on the top?
>
> A:    Right. And that's – to get that what you do is you reapproximate the wound and you can see the blunt margin right here and if you put this back together this margin up at the top is pointed.
>
> Q:    And then the area above that wound, the lighter area is consistent with being caused by the sharp portion of that instrument?
>
> A:    Yes.

*Id.*

Dr. Habbe testified that the wound would be consistent with a knife

wound and that such a wound would be consistent with the knife that the

prosecution introduced into evidence. *Id.* at 2223. This series of questions

between the prosecutor and Dr. Habbe followed:

> Q:   What did you notice about that wound in terms of the regularity of the wound?
>
> A:   Well, if you look at this wound, the margins are not, when it's reapproximated, the margins are not even. There is a little irregularity to the wound. In other words, it goes in and then comes back out and so there is – there is irregularities to the sides of the wound indicating that there is movement during the stab wound. Now the movement could be by the knife or by the person who is getting the wound.
>
> Q:   Now, when you look at that particular knife, State's Exhibit Number 71, is that knife, the width of that knife greater or less than the wound?
>
> A:   It's less.
>
> Q:   With a wound that is greater than the width of the knife what might that indicate?
>
> A:   Well, possibly the same thing. Either movement by the knife as it's going in or movement by the decedent in this case.

*Id.* at 2223-24.

The prosecutor asked how deep the stab wounds went. Dr. Habbe

responded, "[t]he first one was probably not as deep as the second one. This

one goes somewhere in the neighborhood of four to six inches, and understand

that's a guess, basically." *Id.* at 2226.

During closing arguments of the guilt phase of Rhines's trial, the

prosecutor argued that the jury should find Rhines guilty of premeditated

murder. In doing so, he described the manner in which Schaeffer was killed in

order to show that Rhines acted with the intent necessary to support that crime. *See* TT at 2510. For example, he noted that Rhines decided to lie in wait behind a desk when he heard someone enter the store room. *Id.* at 2511. The prosecutor then explained that Rhines knew how to use a knife, and he described the manner in which Rhines held the knife. *Id.* at 2511-12. The prosecutor opined that most people would hold a knife with the blade facing down to avoid possibly cutting themselves, but according to Dr. Habbe's testimony, Schaeffer's wounds indicated that the blade was facing upward when the first stab wound occurred. *Id.* at 2512. The prosecutor then argued: "That knife was held with that blade up for this ripping kind of motion to gut that person[.]" *Id.* at 2512.

The circuit court found that there was evidence to support the prosecutor's argument that the blade was facing upward and that the wound was created by upward movement. It also noted that the prosecutor only used the word "gut" once. The circuit court determined that the prosecutor's use of the word was not so prejudicial that it would undermine the fairness of Rhines's trial. Thus, it rejected Rhines's claim. *See* Docket 204-1 at 29.

Here, Rhines primarily disputes whether there was any evidentiary support for the prosecutor's argument. He notes that Dr. Habbe was uncertain whether the irregularities of the first stab wound came from the movement of the knife or from the movement of the victim. He also argues that Dr. Habbe did not know whether the knife the state introduced into evidence was even the right knife. For that proposition, he notes that Gilbert asked Dr. Habbe

whether the wounds "point[ed] unequivocally to one knife or the other," to which Dr. Habbe responded, "No, that's right." TT 2235.

But the point is not, as Rhines suggests, whether the prosecutor's argument rests on an unassailable foundation. Although Dr. Habbe was not present when the murder occurred and therefore could not be completely sure what instrument was used to create Schaeffer's wounds, he testified that the wounds were consistent with the knife introduced into evidence by the state. He also testified that the irregularities with the first stab wound suggested that it may have been caused by an upward motion. There is, therefore, evidentiary support for the state's argument that Rhines held the knife with the blade facing upward and that he stabbed Schaeffer with an upward motion.

All that remains is whether the prosecutor's use of the word "gut" was so improper that it would undermine the fairness of Rhines's trial. In *Darden*, for comparative purposes, the prosecutor argued that "the only way [he] can be sure" that the defendant would not get out of prison was the imposition of a death sentence. *Darden*, 477 U.S. at 180 n.10. He categorized the defendant as an "animal" and argued that "he shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of the leash." *Id.* nn. 11, 12. The prosecutor also explained how he "wish[ed] someone had walked in the back door and blown [the defendant's] head off[.]" *Id.* at n.12. The Court opined that the prosecutor's "argument deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair." *Id.* at 179. The Court observed that the argument

130

was inflammatory, but it did not misstate the evidence or impugn a constitutional right such as the defendant's right to remain silent. *Id.* at 181-82. Much of the argument, too, was invited by comments made by the defense attorney. *Id.* at 182. Ultimately, the Court agreed that the argument was not so improper to undermine the fairness of the defendant's trial.

Like in *Darden*, the prosecutor in Rhines's case did not misstate the evidence nor did he negatively implicate any of Rhines's constitutional rights. While the use of the word "gut" may not have been invited by defense counsel, the prosecutor used the word only once, and it is far less inflammatory than the comments made by the prosecutor in *Darden*. Thus, this court concludes that the circuit court's determination that the prosecutor's argument did not undermine the fairness of Rhines's trial is not contrary to or an unreasonable application of clearly established federal law. Consequently, Rhines is not entitled to relief on this claim.

### C. Did the prosecutor act improperly by introducing and using the testimony of Glen Wishard?

In his federal habeas petition, Rhines asserted that the prosecutor acted improperly by introducing and using the testimony of Glen Wishard. Docket 73 at 14. The circuit court rejected Rhines's argument. Docket 204-1 at 30. Rhines advances no argument here for why the court's decision was erroneous. This court, therefore, concludes that Rhines has not met his burden to justify relief on this claim.

**D.      Did the prosecutor act improperly by eliminating all jurors who had misgivings about imposing the death penalty?**

Rhines asserts, in conjunction with issues II and III, *supra*, that the prosecutor acted improperly by deliberately excluding jurors that expressed misgivings about the death penalty.  In issues II and III, *supra*, this court concluded that Rhines was not entitled to relief. Because those jurors were not improperly excluded, it follows that the prosecutor did not commit misconduct by excluding them. Thus, Rhines is not entitled to relief on this claim.

## CONCLUSION

The court concludes that Rhines is not entitled to habeas corpus relief on any of the grounds he has asserted. Accordingly, it is

ORDERED that respondent's motion for summary judgment (Docket 225) is granted.

IT IS FURTHER ORDERED that Rhines's amended habeas petition (Docket 73) is denied.

Dated February 16, 2016.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER

UNITED STATES DISTRICT JUDGE

132